STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jeffrey C. DENNY, Defendant-Appellant.

Court of Appeals

*No. 2015AP202–CR. Submitted on briefs November 23, 2015.—Decided March 23, 2016.*

2016 WI App 27

(Also reported in 878 N.W.2d 679.)

† Petition for Review filed.

363

364

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven D. Grunder*, assistant state public defender of Madison and *Lindsey E. Cobbe* of *Wisconsin Innocence Project*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald V. Latorraca*, assistant attorney general, and *Brad D. Schimel*, attorney general.

A nonparty brief was filed by *Robert J. DeBauche* of *DeBauche Law Firm* of Madison, for The Innocence Network.

Before Neubauer, C.J., Reilly, P.J., and Hagedorn, J.

¶ 1. NEUBAUER, C.J. Jeffrey C. Denny appeals from an order denying his motion pursuant to Wis. Stat. § 974.07 (2013–14)[1] to test certain items at private or public expense for the presence of DNA. We hold that it was error to deny Denny's motion. Denny showed that the items he sought to test were relevant to the investigation or prosecution that resulted in his conviction, that it is reasonably probable that he would not have been convicted if exculpatory DNA testing results had been available at the time of his conviction, and the testing he seeks was not available at the time of his conviction. While the test results may be inculpatory, inconclusive or exculpatory, for purposes of this postconviction discovery motion, the statute requires us to assume they will be exculpatory. Therefore, he is entitled to test the items he identified for the presence of DNA either at private or public expense.

## FACTUAL BACKGROUND

### *Discovery of Christopher Mohr's Body and Other Evidence*

¶ 2. On January 26, 1982, Jonathan Leatherman went to the home of his friend, Christopher Mohr, and

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

found him dead. Mohr had suffered blunt force trauma to his head and sustained over fifty stab wounds. His clothes, including a torn shirt, jacket, jeans, and socks, were soaked in blood. Small screens or "screened type filters" were imbedded in Mohr's shirt or the flesh of his back. Hairs were collected from Mohr's face, clothing, and his left hand, many of which contained dried blood. There were pieces of a shattered bong pipe strewn around, on, and under his body. A red lighter, found under Mohr's right shoulder, was covered in blood. A metal lawn chair, tipped over and near Mohr's head, had numerous blood stains. On the floor were two gloves, and at least one of them, as testing would later show, contained blood. Near the gloves was a dark blue stocking-type cap, which also had blood on it. A glass containing an orange liquid, with blood on the outside, had spilled. Ice cubes were found near the glass. Two fiber-type facial breathing masks—one clean, one heavily soiled—were found near a beanbag chair. Outside the room where Mohr's body was found, on the floor of a hallway, was a yellow, blood-stained hand towel. A telephone book, marked by a bloody footprint, lay nearby.

¶ 3. After pursuing a number of leads, the police received a tip that Trent Denny (Trent) told an acquaintance that his brother, Kent Denny (Kent), had admitted to committing the crime. The police interviewed Kent, and then settled on the defendant, Jeffrey Denny (Denny), as an additional suspect. Denny and Kent were charged with first-degree murder and tried jointly.

### The Trial

¶ 4. At trial, the State presented testimony from multiple witnesses who heard Denny inculpate himself.

369

¶ 5. Trent was granted immunity, and he testified that after Kent told him that he killed Mohr, Trent asked Denny if what Kent had told him was true. Denny asked Trent, "[w]hy did Kent tell?" Denny then said that both he and Kent had stabbed Mohr, but that Kent had stabbed him first and in the stomach. Denny recounted that after Kent stabbed Mohr, Kent asked Mohr how he felt. Kent then gave Denny the knife. Denny was scared, he said, and he and Kent decided that they could not let Mohr live. Denny stabbed Mohr. Mohr came after Denny, and Kent then hit Mohr over the head with a bong.

¶ 6. During another conversation, this time with both Kent and Denny, they discussed the clothes they had worn during the murder. They told Trent that they had to dispose of the clothes. Trent testified that he and Kent left their house with Lori Jacque, who drove them to a cemetery. Kent exited the vehicle and returned five minutes later carrying a paper bag that contained clothes. Trent thought he could smell blood on the clothes in the bag. Kent held up a shirt and asked Trent if he could see blood; he said that he could. Jacque drove Kent and Trent to a dump and Kent tossed the bag, now inside a plastic bag, into the dump.

¶ 7. Later, Denny told Trent that Denny had to dispose of the knife. Denny showed Trent the location of the knife, about a hundred yards behind Trent's residence. Trent only saw the handle of the knife and described it as a hunting knife. The police were unable to locate the knife.

¶ 8. Another time, when the three brothers were together, Trent asked Kent and Denny about the murder, and they both told Trent that they did it.

¶ 9. Jacque, who was also granted immunity, testified that she drove Kent and Trent to a graveyard.

Kent exited the vehicle, entered the graveyard, and returned with a bundle of clothes under his arm. Kent held up a shirt to show Trent. Jacque gave Kent a brown paper bag in which to place the clothing. She then drove Kent to a location near a dumpsite in order to dispose of the clothing. The clothing was never found.

¶ 10. Several weeks later, during another car trip, she heard a conversation between Denny and Kent about how they forgot the tennis shoes.

¶ 11. On another occasion, while in Kent's room, Jacque recalled that Denny told her about a scratch on his leg, "from where [Mohr] had scratched him."

¶ 12. Denny's sixteen-year-old girlfriend, Tammy Whitaker, testified that Denny told her about the murder. Denny claimed that Leatherman went to Mohr's house, started fighting with him, and then stabbed him. Denny told Whitaker that Leatherman asked Denny to help, and Denny then hit Mohr.

¶ 13. On another occasion, Denny told Whitaker that he and Kent went to Mohr's house, and Kent started stabbing Mohr. Denny went into the bathroom and asked himself what he had gotten into. Denny did not implicate Leatherman on this occasion. Denny told Whitaker that he got a quarter pound of marijuana from the murder.

¶ 14. Patricia Robran, a friend of Denny, testified regarding a conversation she had with him. She recalled that he was crying, and, when she asked why, he said that he and his brother Kent had killed the "boy in Grafton." According to Denny, Kent had asked Mohr how he was feeling, and Mohr replied that he was fine. Kent then stabbed Mohr, and asked how he felt now. Denny admitted to Robran that he and Kent had stabbed Mohr and hit him with a bong. Kent stabbed

371

the victim first and then handed the knife to Denny, telling him to keep doing what Kent had been doing until he returned. Denny stabbed Mohr, but could not remember if it was "five, ten, or fifteen times." Denny explained that all he got out of the murder was a quarter pound of marijuana.

¶ 15. Steve Hansen testified that Denny told him that he and Kent killed Mohr. Denny explained that they went to Mohr's house and went up to his bedroom. Kent pulled a knife and stabbed Mohr. In a prior statement to police, Hansen recalled that Denny stated that Mohr was standing near a window when Kent pulled out a knife. Kent looked at Mohr and looked at Denny. Denny nodded his head and Kent started stabbing Mohr in the stomach. After Mohr fell to the floor, Denny kicked Mohr in the stomach.

¶ 16. Daniel Johansen, who was an inmate with Denny while housed at Ozaukee county jail, testified that Denny told him that he participated in the murder of Mohr. Johansen explained that Denny and Kent went to Mohr's home. Denny left the room, and then heard Kent ask Mohr, "how does this feel?" Denny returned to the room and saw that Kent had stabbed Mohr in the stomach. "Kent just started stabbing him," he testified. Denny also hit Mohr over the head with a bong and kicked him a couple times. Denny told Johansen that he took some shoes to a sewage treatment plant.

¶ 17. Kent made multiple inculpatory statements to others. He also implicated Denny in statements to one witness.

¶ 18. Several witnesses testified regarding the disposal and recovery of the shoes Denny had been wearing at the time of the murder. Whitaker recalled being at the Denny house with Denny, Kent, Tod

Trierweiler, and Russell Schram. Whitaker saw Schram put shoes into a brown paper bag. Schram told her the shoes were the "murder shoes." Schram put the bag in Trierweiler's car on the backseat. Whitaker and the others drove to a gas station. While Trierweiler put gas in the car and paid inside the station, Denny and Schram moved the bag from the interior of the car to the trunk.

¶ 19. Tod Trierweiler testified that he gave Denny a ride to Port Washington. While stopped at a Clark gas station, Denny asked Trierweiler for the keys. Denny then took the keys and placed a brown grocery bag in the trunk, while Trierweiler filled the car with gas and paid the attendant.

¶ 20. Schram also remembered being at the Denny house with Denny, Kent, Trierweiler, and Whitaker. Schram recalled Denny removing a brown paper grocery bag from a closet, taking it out to a car, and placing it on the backseat. Before Denny put the bag in the car's backseat, Denny told Schram that the "murder shoes" were in the bag. After stopping at a gas station, Denny asked Trierweiler for the keys to the trunk. Trierweiler gave him the keys and Denny placed the grocery bag into the trunk. Denny subsequently contacted Schram on a couple of occasions and told Schram that he had to get the shoes out of the car. Schram told Denny that he could get the shoes from Trierweiler. Denny subsequently called Schram from jail and told Schram not to say anything about the shoes or he would become an accessory to the murder. Schram also recalled a conversation with Denny in which Denny told him how long it takes a person to die.

¶ 21. Sometime after Denny placed the bag with the shoes inside Trierweiler's trunk, Trierweiler looked in the trunk. He opened a bag and saw two pairs of

373

shoes—a pair of blue and white tennis shoes and a pair of brown loafers. Trierweiler gave the loafers to Cindy Otto's brother from Texas. Trierweiler wore the tennis shoes everyday for approximately three months. Trierweiler eventually turned the shoes over to the police.

¶ 22. Otto testified that she remembered Trierweiler finding the shoes in a grocery bag in Trierweiler's trunk. She recalled that Trierweiler wore the tennis shoes and gave a pair of shoes to her brother.

¶ 23. The State compared the shoes recovered from Trierweiler to the bloody footprint on the phone book found in the hallway leading to Mohr's room, but the State could not determine that it was the same shoe or even the same-sized shoe.

¶ 24. None of the blood or hair that was collected at the crime scene was matched to Denny.

¶ 25. The jury returned a verdict finding Denny and Kent guilty of first-degree murder. They were sentenced to life imprisonment. Denny appealed, and the judgment of conviction was affirmed.

### Denny's Motion for Postconviction DNA Testing

¶ 26. In May 2014, Denny moved to have certain evidence recovered from the crime scene tested for DNA. He identified the following items for testing: (1) pieces of a bong pipe, (2) hairs removed from Mohr's hands, (3) stray hairs found on Mohr's body, (4) the yellow hand towel, (5) the gloves found near Mohr, (6) the bloody hat found near Mohr, (7) Mohr's bloody clothing, (8) blood on the metal chair found near Mohr's head, (9) the glass cup found near Mohr, (10) the lighter that was under Mohr's right shoulder,

(11) the screens found on Mohr's back and clothing, (12) the two facial breathing masks, and (13) Mohr's hair.

¶ 27. Denny argued that this evidence was relevant to the investigation or prosecution that resulted in his conviction, that it was in the possession of the State, and that this evidence either had not been previously subjected to forensic DNA testing or, if it had been previously tested, it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results. In addition, Denny argued that it was "reasonably probable" that he would not have been prosecuted or convicted if "exculpatory DNA results had been available before" the prosecution or conviction. As such, Denny argued, he was entitled to have these items tested at the public's expense or, at the very least, at private expense.

¶ 28. The trial court denied Denny's motion. It concluded that the evidence requested for testing did not relate to any of the evidence presented against Denny at trial, because the evidence that resulted in his conviction was the inculpatory statements he and Kent made to others. In any event, the trial court noted, Denny was convicted as a party to a crime; thus, even if DNA evidence established that another person was involved in the crime, it would not change the evidence that Denny participated in the murder as a party to a crime. The purpose of Wis. Stat. § 974.07, the trial court said, was to exonerate the innocent, and not to show that someone else was involved in the murder.

Finally, the results would not exculpate Denny; rather, it would show that others, in addition to Denny, might have been involved.

## ANALYSIS

### *Standard of Review and Statutory Interpretation*

**[1]**

¶ 29. Denny's right to obtain and test certain biological material pursuant to WIS. STAT. § 974.07 involves statutory interpretation and the application of that statute to specific facts. *State v. Moran*, 2005 WI 115, ¶ 26, 284 Wis. 2d 24, 700 N.W.2d 884. These are questions of law that we review de novo. *Id.*

¶ 30. "[S]tatutory interpretation 'begins with the language of the statute,'" and if the meaning of the statute is plain, the inquiry typically ends there. *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* In determining a statute's plain meaning, the scope, context, structure, and purpose are important. *Id.*, ¶ 48.

¶ 31. The determinations of whether the evidence Denny seeks to test is relevant and whether it is reasonably probable that he would not have been convicted if exculpatory DNA tests were available are matters committed to the discretion of the trial court. *See Moran*, 284 Wis. 2d 24, ¶ 45; *State v. Hudson*, 2004 WI App 99, ¶ 16, 273 Wis. 2d 707, 681 N.W.2d

316. Thus, we will uphold a trial court's exercise of discretion if it "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a rational process." *State v. Weed*, 2003 WI 85, ¶ 9, 263 Wis. 2d 434, 666 N.W.2d 485.

*The Text of* WIS. STAT. *§ 974.07*

¶ 32. As relevant, WIS. STAT. § 974.07 provides as follows:

(2) At any time after being convicted of a crime, adjudicated delinquent, or found not guilty by reason of mental disease or defect, a person may make a motion in the court in which he or she was convicted, adjudicated delinquent, or found not guilty by reason of mental disease or defect for an order requiring forensic deoxyribonucleic acid testing of evidence to which all of the following apply:

(a) The evidence is relevant to the investigation or prosecution that resulted in the conviction, adjudication, or finding of not guilty by reason of mental disease or defect.

(b) The evidence is in the actual or constructive possession of a government agency.

(c) The evidence has not previously been subjected to forensic deoxyribonucleic acid testing or, if the evidence has previously been tested, it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results.

. . . .

(6)(a) Upon demand the district attorney shall disclose to the movant or his or her attorney whether

377

biological material has been tested and shall make available to the movant or his or her attorney the following material:

. . . .

2. Physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material.

. . . .

(d) This subsection does not apply unless the information being disclosed or the material being made available is relevant to the movant's claim at issue in the motion made under sub. (2).

(7)(a) A court in which a motion under sub. (2) is filed shall order forensic deoxyribonucleic acid testing if all of the following apply:

1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).

2. It is reasonably probable that the movant would not have been prosecuted, convicted, found not guilty by reason of mental disease or defect, or adjudicated delinquent for the offense at issue in the motion under sub. (2), if exculpatory deoxyribonucleic acid testing results had been available before the prosecution, conviction, finding of not guilty, or adjudication for the offense.

3. The evidence to be tested meets the conditions under sub. (2)(a) to (c).

. . . .

(10)(a) If the results of forensic deoxyribonucleic acid testing ordered under this section support the movant's claim, the court shall schedule a hearing to determine the appropriate relief to be granted to the movant. After the hearing, and based on the results of

378

the testing and any evidence or other matter presented at the hearing, the court shall enter any order that serves the interests of justice, including any of the following:

1. An order setting aside or vacating the movant's judgment of conviction . . . .

2. An order granting the movant a new trial . . . .

3. An order granting the movant a new sentencing hearing . . . .

4. An order discharging the movant from custody . . . .

5. An order specifying the disposition of any evidence that remains after the completion of the testing . . . .

(b) A court may order a new trial under par. (a) without making the findings specified in [WIS. STAT.

. . . .

(12)(a) The court may order a movant to pay the costs of any testing ordered by the court under this section if the court determines that the movant is not indigent.

*The Supreme Court's Decision in State v. Moran*

¶ 33. In *Moran*, 284 Wis. 2d 24, ¶ 55, our supreme court interpreted WIS. STAT. § 974.07 to permit DNA testing of evidence at either private or public expense. Section 974.07(6)(a) gives a movant, at his or her own expense, the right to conduct DNA testing of "[p]hysical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material," if the movant meets the prerequisites of § 974.07(2), namely, that the evidence is relevant to the investigation or prosecution that resulted in the

379

conviction; the evidence is in the actual or constructive possession of a government agency; and the evidence has not been subjected to forensic DNA testing or, if so tested, may now be subjected to another test that was not available or not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results. *Moran*, 284 Wis. 2d 24, ¶¶ 3, 42.

¶ 34. WISCONSIN STAT. § 974.07(7)(a) requires a court to order DNA testing at public expense if the movant meets certain "heightened requirements," *Moran*, 284 Wis. 2d 24, ¶ 57, namely, the movant claims that he or she is innocent of the offense at issue; the movant meets the requirements of § 974.07(2); it is reasonably probable that the movant would not have been prosecuted or convicted if exculpatory DNA testing results had been available before the prosecution or conviction; and the chain of custody of the evidence to be tested establishes that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the evidence, the testing itself can establish the integrity of the evidence.

*The Relevance of the Evidence Denny Seeks to Test*

¶ 35. Denny argues that the trial court erred in its interpretation of what constitutes evidence "relevant to the investigation or prosecution that resulted in [his] conviction" because the court found that the requested items did not result in his conviction. He also argues that the court erred in concluding that the evidence was not relevant because he was convicted as a party to a crime, and thus, it would not exonerate

380

him if someone else's DNA were found on the items, because he could have been a mere lookout.

¶ 36. The State counters that the trial court's interpretation was correct. The State adds that the evidence is irrelevant because Denny has not shown that there is a reasonable likelihood that DNA evidence will be found on the evidence to be tested. More specifically, his "assertion that an assailant may have left his skin cells on an object at the crime scene is simply too speculative to assert that the object contains biological material for testing." Further, the State argues, Denny ignores several challenges with respect to "touch DNA" such as the potential for contamination and degradation. Even if touch DNA were recovered, Denny failed to demonstrate that the results would be relevant because, for example, there is no way to determine when the contributor deposited the DNA on the evidence.[2]

*WIS. STAT. § 974.07(2)(a) Requires Only that "The Evidence is Relevant to the Investigation or Prosecution that Resulted in the Conviction."*

¶ 37. As Denny correctly contends, the trial court erred in its interpretation of what constitutes evidence "relevant to the investigation or prosecution that resulted in [his] conviction." Finding that the items did

---

[2] The State also argues that the supreme court erred in *State v. Moran*, 2005 WI 115, ¶ 33, 284 Wis. 2d 24, 700 N.W.2d 884, when it interpreted WIS. STAT. § 974.07(6)(a) to permit a defendant to test evidence for DNA at his or her own expense. The State recognizes that we are powerless to overrule, modify or withdraw language from *Moran, see Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), but nevertheless advances this argument for purposes of preservation.

not result in the conviction, the trial court, in essence, read this paragraph as limited to inculpatory evidence presented at trial. But, the plain language of WIS. STAT. § 974.07(2)(a) is not limited to either inculpatory evidence or to evidence presented at trial. It includes "relevant" evidence, meaning "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. Such "relevant" evidence may be generated during the investigation "that resulted in the conviction," whether or not that evidence was ever presented at trial. Sec. 974.07(2)(a). It is not difficult to imagine a scenario where evidence recovered during the investigation, but not presented at trial, is, due to advancement in scientific techniques, relevant. *See State v. McCollum*, No. 83CRS15506–07, 2014 WL 4345428 (N.C. Super. Sept. 2, 2014) (DNA evidence from cigarette butt found at the scene of the crime cleared two men of thirty-year-old rape and murder convictions).

¶ 38. Thus, the trial court applied an improper legal standard when concluding that the evidence Denny wants tested was not relevant because it did not result in the conviction. *See Moran*, 284 Wis. 2d 24, ¶ 45 (noting that "the circuit court has 'considerable discretion' in determining whether a particular piece of evidence is 'relevant' ") (citation omitted); *Weed*, 263 Wis. 2d 434, ¶ 9 (stating that a trial court's exercise of discretion will be upheld if the court "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a rational process").

¶ 39. Applying the correct interpretation of WIS. STAT. § 974.07(2)(a) to the facts of this case leads to the conclusion that the evidence sought to be tested meets the requirements of that paragraph. Each of the items Denny seeks to test was recovered during the processing of the crime scene and was either presented as exhibits and/or testified to at trial.[3] Given the nature of the crime scene, and the manner in which Mohr was murdered, the perpetrator(s) might have left DNA evidence, whether in the form of blood, hair, saliva, skin, sweat or other biological material, on the items Denny identified for testing.

¶ 40. For example, the medical examiner concluded that Mohr suffered blunt force trauma as the result of being struck with a bong pipe, which the assailant(s) must have touched and, thus, could have left DNA. Mohr was found clutching a number of hairs in his hands, and the nature of the crime scene suggested a struggle; thus, Mohr might have pulled out hair from the perpetrator(s)' head, which could contain DNA material. Many of the items Denny identified, such as the yellow hand towel and the gloves, contained blood which, again, given the nature of the scene, could have come from the perpetrator(s).

¶ 41. The trial court's conclusion that the items sought to be tested were not relevant because Denny was convicted as a party to the crime was also error. The trial court construed Denny's motion as made for the purpose of "show[ing] that someone other than

---

[3] The facial breathing masks were not entered into evidence at trial. Nevertheless, during the police's processing of the scene, they collected the masks, making them relevant to the investigation that resulted in Denny's conviction.

Denny inflicted the wounds," which would have been futile since he was charged as a party to the crime. The trial court considered that "[a] jury could have found Denny guilty as a party to the crime if he acted in concert with the others who inflicted the wounds, while Denny stood lookout in the hallway, leaving none of his DNA at the scene." But, this was not the State's theory at trial. Denny was not a mere "lookout," but described by multiple witnesses, as recounted in the State's closing argument, as having stabbed Mohr, possibly "five, ten, fifteen times." If, as Denny argues, testing of the items should show that another person's DNA is on several of the items, and that the DNA of Denny is not on any of the items identified, such would call into doubt Denny's participation in the murder of Mohr.

*WIS. STAT. § 974.07(2)(a) Does Not Require a Defendant to Prove that Requested Items Contain Biological Material, Only that it is Relevant.*

¶ 42. We decline to graft onto the statute the State's additional requirement that Denny was required to demonstrate there is "a reasonable likelihood that DNA evidence will be found on the evidence to be tested." Under WIS. STAT. § 974.07(2)(a), the moving defendant must identify relevant "evidence" that is in the actual or constructive possession of the government and not previously tested. When the evidence is shown to be relevant, § 974.07(6)(a) puts the onus on the district attorney to disclose, upon demand, "[p]hysical evidence . . . that contains biological material or on which there is biological material." Sec. 974.07(6)(a)2.

384

¶ 43. Again, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. If an item collected during a crime scene investigation has any tendency to contain biological material capable of DNA testing, including blood, hair, saliva, skin cells, sweat or other biological material, that is sufficient to establish relevance. *See Moran*, 284 Wis. 2d 24, ¶ 45 (the "appropriate inquiry" is "whether there is a logical or rational connection between the fact which is sought to be proved and a matter of fact which has been made an issue in the case").[4]

¶ 44. Putting the onus on a defendant to prove that an item contains biological material would pose serious impediments, and perhaps insurmountable barriers, to him or her ever obtaining testing since these items are in the possession of the State. And testing is often required simply to determine if microscopic biological material containing DNA is on the evidence. *See* National Institute of Justice, *DNA Evi-*

---

[4] The State urges us to graft this additional requirement onto WIS. STAT. § 974.07, relying on the interpretation of the Texas Court of Criminal Appeals of its own prior DNA testing statute as persuasive authority (citing *Holberg v. State*, 425 S.W.3d 282, 285 (Tex. Crim. App. 2014)). However, the Texas statute provided that a convicted person may move for testing of "evidence containing biological material," whereas Wisconsin's statute contains no such requirement. TEX. CODE CRIM. PROC. ANN. art. 64.01(a1) (West 2011) (repealed 2015). Moreover, the Texas legislature, recognizing that *Holberg* "severely restricts a judge's ability to order DNA testing," recently amended it to create a lesser burden on the movants. S. 2015–487, 84 REG. SESS., at 1 (Tex. 2015).

*dence: Basics of Identifying, Gathering and Transporting,* http://www.nij.gov/topics/forensics/evidence/dna/basics/pages/identifying-to-transporting.aspx) (Aug. 9, 2012). The statute places the burden on the State to identify and produce evidence containing biological material when the movant establishes relevance.

¶ 45. Nearly all of the items Denny identified contain biological material in the form of blood or hair, thereby satisfying Wis. Stat. § 974.07(2). For those items where it is not evident to the naked eye that they contain biological material—one glove and one mask—it is enough for purposes of seeking testing that Denny identified that they may be relevant, i.e., have a tendency to contain biological material capable of DNA testing because the assailant(s) may have handled them, given the nature of the crime scene.

¶ 46. The State's remaining arguments on the issue of relevance pertain to the possibility that any DNA has degraded, been cross-contaminated with DNA from other, probably innocent, contributors, or would give no insight as to when the DNA was deposited. At this juncture, all of these arguments are premature. The limitations of DNA testing cannot be known until testing occurs. Such potentialities, if they come to fruition, would bear on Denny's right to a retrial. *See* Wis. Stat. § 974.07(10)(a) ("If the results of forensic [DNA] testing ordered under this section support the movant's claim, the court shall schedule a hearing to determine the appropriate relief to be granted to the movant."). At this point, though, he seeks only to test these items. *See Moran,* 284 Wis. 2d 24, ¶ 47 (allowing defendant "to test the evidence at his expense does not guarantee that he will get a new trial, or even an evidentiary hearing"). "Relevant

results," as the State puts it, need not be established before a defendant is able to test relevant "evidence."

¶ 47. Therefore, we conclude that Denny has shown that "the evidence meets the conditions under Wis. Stat. § 974.07(2)," permitting him to test that evidence at his own expense.[5] *Moran*, 284 Wis. 2d 24, ¶ 3.

*It is Reasonably Probable that Denny Would*
*Not Have Been Convicted Had Exculpatory*
*Results Been Available*

¶ 48. As already discussed, in order to be entitled to testing at public expense, Denny must meet "heightened requirements," *Moran*, 284 Wis. 2d 24, ¶ 57, including that "[i]t is reasonably probable that [he] would not have been . . . convicted . . . for the offense . . . if exculpatory [DNA] testing results had been available before the . . . conviction." Wis. Stat. § 974.07(7)(a)2.[6] The parties dispute the meaning of "reasonably probable," with Denny asserting that we should apply the standard in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)—"a probability

---

[5] Although Denny may conduct DNA testing at his own expense, we proceed to analyze whether he would be entitled to DNA testing at State expense because this is the complete relief he seeks. In other words, granting him testing but at his expense would be only partial relief. *Cf. Moran*, 284 Wis. 2d 24, ¶ 55.

[6] Wisconsin Stat. § 974.07(7)(a)2. also asks if it is reasonably probable that a movant would not have been prosecuted if exculpatory DNA results existed. However, the gulf between proof sufficient to bring a criminal charge and proof sufficient to sustain a conviction is so large, we analyze only the latter. It is far easier for a movant to raise a reasonable doubt than a lack of probable cause.

sufficient to undermine confidence in the outcome" or the undermine-confidence test—whereas the State asserts that we should apply the standard on a motion for a new trial based on newly discovered evidence—"a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt" or the outcome-determinative test. *State v. Love*, 2005 WI 116, ¶ 44, 284 Wis. 2d 111, 700 N.W.2d 62 (alterations in original; citation omitted). To the extent the parties are arguing that the standard turns on whether we are making an assessment of the reliability of the outcome as opposed to whether the outcome would have been different, this is a "very fine distinction" that would affect only "the rare case." *State v. Edmunds*, 2008 WI App 33, ¶ 22, 308 Wis. 2d 374, 746 N.W.2d 590; *see Strickland*, 466 U.S. at 697 (noting that while the outcome-determinative test imposes a heavier burden on defendants, the difference between it and the undermine-confidence test will alter the merit of an ineffectiveness claim "only in the rarest case").

¶ 49. In any event, we are persuaded that Denny's interpretation is the correct one. The standard the State invokes concerns a motion for a *new trial* based on newly discovered evidence. While the evidence here would be new in a sense, in what it reveals, Denny is not, at this point, seeking a new trial. Rather, he is seeking the disclosure of certain items in the State's possession containing "biological material" for the purpose of testing them for DNA, using Wis. Stat. § 974.07, which is a "post-conviction discovery statute," to do so. *Moran*, 284 Wis. 2d 24, ¶¶ 35, 47 ("Allowing [a defendant] to test the evidence . . . does not guarantee that he [or she] will get a new trial, or even an evidentiary hearing."). Wisconsin's statute does not explicitly em-

388

ploy a new trial analysis until *after* the DNA testing has been done. Sec. 974.07(10)(a) and (b).

¶ 50. Further, our supreme court has used the undermine-confidence test in assessing a defendant's right to postconviction discovery under the due process clause. *State v. O'Brien*, 223 Wis. 2d 303, ¶ 24, 588 N.W.2d 8 (1999); *see State v. Grady*, 2006 WI App 188, ¶ 9, 296 Wis. 2d 295, 722 N.W.2d 760 ("We presume that the legislature acts with full knowledge of existing case law when it enacts a statute."). The undermine-confidence test is employed to determine whether the sought after discovery is material—or consequential. *O'Brien*, 223 Wis. 2d 303, ¶ 24 ("[E]vidence is [consequential] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (alterations in original; citation omitted).

¶ 51. The State cites to *Hudson*, 273 Wis. 2d 707, ¶ 17, in support of its argument that the newly discovered evidence test should apply at this discovery juncture. A review of the parties' briefs in *Hudson* and the decision itself reveals that this issue was never "contested [or] decided." *Silver Lake Sanitary Dist. v. DNR*, 2000 WI App 19, ¶ 13, 232 Wis. 2d 217, 607 N.W.2d 50. Rather, the parties were more concerned with the standard of review on appeal. *Hudson*, 273 Wis. 2d 707, ¶¶ 14–16. Our court simply accepted what Hudson had "note[d]," that "the question is whether it is reasonably probable that exculpatory DNA testing results would raise a reasonable doubt about Hudson's guilt." *Id.*, ¶ 17. In addition, this language "reasonably probable . . . would raise a reasonable doubt," is sometimes invoked without clarification as to whether the reference is to the outcome-

determinative test or the undermine-confidence test. Indeed, even in *Strickland,* the Court said, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[7] *Strickland,* 466 U.S. at 695. Thus, since the issue was never contested or decided, and the language in *Hudson* is unclear as to which test it used, *Hudson* is not controlling.

¶ 52. Finally, it is appropriate to use the undermine-confidence test given the difficulty in anticipating DNA results and the jurors' assessment of the impact of the assumed exculpatory evidence on the other evidence introduced at trial. As one of the many courts employing the undermine-confidence test to analyze postconviction DNA testing motions noted, the test appropriately focuses on the fairness and reliability of the verdict.[8] *State v. Dupigney,* 988 A.2d 851,

---

[7] As the dissent notes, courts use the phrases "reasonably probable" and "reasonable probability" interchangeably in applying the undermine-confidence test. *See Kyles v. Whitley,* 514 U.S. 419, 441 (1995) (failure to disclose suppressed evidence in violation of *Brady* [*v. Maryland,* 373 U.S. 83 (1963)] "would have made a different result reasonably probable"); *cf. United States v. Bagley,* 473 U.S. 667, 682 (1985) (applying "reasonable probability" test to *Brady* violation).

[8] As the United States Supreme Court has explained,

[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) .... [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

858–59 (Conn. 2010); *see also State v. Hammond*, 93 So. 3d 172, 177 (Ala. Crim. App. 2012); *Richardson v. Superior Court*, 183 P.3d 1199, 1205 (Cal. 2008); *Hood v. United States*, 28 A.3d 553, 564 (D.C. 2011); *State v. Rodriguez*, 350 P.3d 1083, 1088 (Kan. 2015); *Powers v. State*, 343 S.W.3d 36, 55 (Tenn. 2011); *In re Towne*, 86 A.3d 429, 434 (Vt. 2013).

¶ 53. Next, the parties dispute whether Wis. Stat. § 974.07(7)(a)2. requires us to assume that the results of DNA testing will be exculpatory. Again, we agree with Denny's interpretation. The language of § 974.07(7)(a)2. is plain, requiring us to determine whether it is reasonably probable that the movant would not have been prosecuted or convicted if exculpatory DNA testing results had been available before the prosecution or conviction.

¶ 54. The State insists that "[a] DNA result can only be exculpatory if it is 'reasonably probable that the movant would not have been prosecuted [or] convicted.' " But, this interpretation would alter the commonly understood meaning of exculpatory and render the reasonable probability of a different outcome requirement useless. Reasonably probable does not define exculpatory. Exculpatory must be given its "common, ordinary, and accepted meaning," *Kalal*, 271 Wis. 2d 633, ¶ 45, that is, evidence tending to establish innocence. *Exculpatory Evidence,* Black's Law Dictionary (10th ed. 2014). Then, the assumed exculpatory DNA results must be considered against the other evidence presented at trial to determine if "[i]t is reasonably probable that the movant would not have

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citation omitted).

391

been . . . convicted." WIS. STAT. § 974.07(7)(a)2. Thus, "reasonably probable" is rightly understood as a separate showing.

¶ 55. This interpretation, contrary to the State's contention, will not lead to "postconviction DNA testing in every single case where items of evidence that conceivably could contain DNA are recovered from a crime scene," because the assumed exculpatory evidence will be weighed against the inculpatory evidence presented at trial. In other words, the reasonably probable test acts as a limiting principle on a movant's right to test evidence for the presence of DNA. *See Hudson*, 273 Wis. 2d 707, ¶¶ 13, 19–21 (affirming trial court's determination that it was not reasonably probable that defendant would not have been convicted even if DNA testing returned the results he envisioned, in light of the overwhelming evidence of guilt).

¶ 56. With that proper understanding, we must determine to what extent should a court consider the results exculpatory. Denny argues that there may be "[a] variety of exculpatory DNA testing results." *See State v. Peterson*, 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003) (noting the same). Here, Denny has not identified any potential third-party perpetrator. Thus, he posits that DNA testing on one or more items could match a convicted offender and establish that Denny did not touch any of the items; or that Denny could be excluded as a source of DNA on all items; or that DNA on multiple items could be matched to an unknown third party.

¶ 57. WISCONSIN STAT. § 974.07(7)(a)2. permits assumed exculpatory test results. Given the important statutory goals of exonerating the wrongly convicted and identifying and apprehending perpetrators who

may be at large, we conclude that Denny is entitled to the most favorable test results in light of the evidence at trial. *See Powers*, 343 S.W.3d at 55 ("trial court should postulate whatever realistically possible test results would be most favorable to the defendant in determining whether he has established the reasonable probability requirement") (citation omitted); *In re Towne*, 86 A.3d at 434 (assuming, "as we must," best case scenario). Thus, here, Denny is entitled to assumed exculpatory test results showing that another identified individual's DNA is found on all of the collected evidence, and none of Denny's is found. It could be that the test results will show that the DNA belongs to a convicted offender, presumably since the DNA profile obtained from the items will be run through databases containing convicted offenders. However, the nature of the conviction or any additional information learned as a result of the DNA testing would be for Denny to develop at a subsequent hearing. *See* Wis. Stat. § 974.07(10)(a) (directing the court to enter an order that serves the interest of justice "[a]fter the hearing, and based on the results of the testing and *any evidence or other matter presented at the hearing*") (emphasis added).

¶ 58. Next, as part of the assessment as to whether it is reasonably probable that Denny would not have been convicted, the State urges us to apply the "legitimate tendency" test. *See State v. Denny*, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984). When a defendant seeks to present evidence to the jury at trial that a third party committed the crime, there must be a "legitimate tendency" that a third party could have committed the crime; "in other words, that the third party had motive, opportunity, and a direct

393

connection to the crime." *State v. Wilson*, 2015 WI 48, ¶ 3, 362 Wis. 2d 193, 864 N.W.2d 52. At this stage, though, applying the legitimate tendency test to determine if the DNA test results would be admissible is premature. Again, Denny is only seeking to test certain items for DNA. Moreover, at this point, given that Denny has not identified any potential third-party in his motion, he could not be expected to meet the three-prong legitimate tendency test of motive, opportunity, and direct connection.

¶ 59. Finally, applying the correct legal standards, the exculpatory evidence is weighed against the inculpatory evidence presented at trial to determine if it is reasonably probable that Denny would not have been convicted. In making its own assessment, the trial court did not weigh the evidence but concluded that "DNA tests could not exculpate Denny." This conclusion was, as discussed above, based on an erroneous relevancy analysis, i.e., that the items for which Denny sought testing did not "result in his conviction," because the inculpatory evidence resulted in his conviction. The court also applied an improper standard of law in concluding that there was no reasonable probability that the results would be exculpatory, failing to assume that the test results would be exculpatory. Based on these improper standards of law, the court erroneously concluded that Denny could only show that an additional person was involved, which would not undermine his conviction as a party to a crime. *See Hudson*, 273 Wis. 2d 707, ¶ 16 (reviewing reasonably probable determination under the erroneous exercise of discretion test, which requires that the trial court examine the relevant facts, apply a proper legal stan-

dard, and reach a reasonable conclusion using a rational process).[9]

■■

¶ 60. Examining the evidence, there was no physical evidence linking Denny to the crime. The bloody footprint that was left on the phone book in the hallway of Mohr's residence could not be matched to the shoes that Denny placed in the trunk of Trierweiler's car. There were no eyewitnesses to the crime.

¶ 61. True, the multiple inculpatory statements Denny made to several witnesses was powerful evidence. Yet, during trial and in summation, defense counsel was able to question the credibility of several of those witnesses. Trent had four criminal convictions, was granted immunity for his testimony, and acknowledged that every time he heard a conversation involving Denny he was ingesting drugs or alcohol or both. *See Loveday v. State*, 74 Wis. 2d 503, 520, 247 N.W.2d 116 (1976). Trent recounted that the district attorney told him that the case would turn on his testimony. Jacque too was granted immunity for her testimony. During cross-examination, Jacque acknowledged that during the course of several interviews with the police she had lied and withheld information from them. Her trial testimony that she drove Kent and Trent to a graveyard was impeached with testimony she gave at a preliminary hearing where she testified it was Denny and maybe Kent who was in the car, although she did not think Kent was present. At the preliminary hearing, she also testified that it was Denny who said during the car trip to the graveyard that there were

---

[9] Denny contends he is innocent in an affidavit included in his motion. At trial, neither he nor Kent testified, relying largely on a reasonable doubt argument.

some clothes they wanted to dispose of. Jacque acknowledged that on the evening prior to the second car trip, she possibly attended a party, that the party may have lasted a long time, and that at every party she attended, she consumed alcohol and drugs, albeit sometimes more and sometimes less. Whitaker acknowledged that Denny told her ten different stories about the death of Mohr, that one involved Leatherman, that two or three involved Kent and Denny, and that the rest "wasn't really involvement, it was just, well, I suppose, I don't know." Denny usually made these statements, Whitaker testified, when she was "partying," meaning, "gettin[g] high." Hansen, when cross-examined, acknowledged that his memory of his conversations with Denny was very bad. Johansen, at eighteen years of age, had three convictions, two of which were for burglary, and was awaiting sentencing at the time of his testimony.

¶ 62. When we take all of this into account—the lack of physical evidence connecting Denny to the scene, the inculpatory statements he made, the manner in which the credibility of certain witnesses was called into question, and an identified third party in the DNA test results and none of Denny's—we conclude that it is reasonably probable that Denny would not have been convicted, that is, a probability sufficient to undermine confidence in the outcome. *See generally People v. Harris,* 936 N.Y.S.2d 233, 244–46 (N.Y. App. Div. 2012), *aff'd,* 956 N.Y.S.2d 478 (N.Y. 2012) (erroneous admission of defendant's inculpatory statements, which corroborated the testimony of witnesses, several of whom testified pursuant to cooperation agreements with the prosecution, was not harmless error).

¶ 63. Under the law, a reasonable doubt in the mind of one or more jurors would preclude a conviction.

Presumably the items at issue would have been tested by the State for DNA, had the scientific advances been available, in the search to identify the true perpetrator. *See* WIS. STAT. § 165.77(2)(a) (laboratories are required to analyze DNA in a specimen when requested by law enforcement regarding an investigation). In determining prejudice in the context of ineffective assistance of counsel, the United States Supreme Court noted, "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *See Strickland*, 466 U.S. at 695–96. Here, if we assume that the profile on all the items does not match Denny's, and matches that of a convicted offender, as we must, it could cast the case in a completely different light. *Powers*, 343 S.W.3d at 55 (despite eyewitness identification by four victims and other evidence which "overwhelmingly" supported the defendant's rape conviction, DNA testing identifying a convicted offender and not the defendant would establish a reasonable probability that the defendant would not have been convicted). Denny is entitled to have the items he identified tested at public expense.

## CONCLUSION

¶ 64. The trial court erred in denying Denny's motion to test certain items at private or public expense for the presence of DNA as his motion satisfied the requirements of WIS. STAT. § 974.07(6)(a) and (7)(a). We, therefore, reverse and remand with instructions for the trial court to impose reasonable conditions on the testing ordered so as to protect the integrity of the evidence and the testing process and, if appropriate, to order the state crime laboratories to perform the testing or, after consulting with Denny and the district

attorney, to order that the material be sent to a facility other than the state crime laboratories for testing, in accordance with § 974.07(8).

*By the Court.*—Order reversed and cause remanded with directions.

¶ 65. HAGEDORN, J. (*concurring in part; dissenting in part*). There is much in the majority opinion to commend. The opinion makes clear that the test for satisfying the relevance requirement in WIS. STAT. § 974.07(2) is simply the standard definition in WIS. STAT. § 904.01. *See* Majority, ¶ 37; *see also State v. Moran*, 2005 WI 115, ¶ 45, 284 Wis. 2d 24, 700 N.W.2d 884. I agree with the majority that the State's attempt to make this a more exacting standard—an approach the trial court adopted—is inconsistent with the statutory language. The majority also correctly dismisses the State's argument that Denny needs to prove the DNA evidence exists and is not contaminated; nothing in the statute supports such additional prerequisites. Majority, ¶¶ 42–46. Indeed, I join the majority in concluding that Denny has met the standards articulated in § 974.07(2), and that per the supreme court's interpretation of this statute,[1] § 974.07(6) entitles him to testing at his own expense. Majority, ¶ 47.

---

[1] In *Moran*, the supreme court concluded that WIS. STAT. § 974.06 provides for testing at private expense if the conditions of WIS. STAT. § 974.02 are met. *State v. Moran*, 2005 WI 115, ¶¶ 49–55, 284 Wis. 2d 24, 700 N.W.2d 884. It further concluded that WIS. STAT. § 974.07 governs testing at State expense and contains additional requirements. *Moran*, 284 Wis. 2d 24, ¶¶ 49–55. The State has indicated that it believes this is a misreading of the statute and offers reasonable arguments supporting that notion. Even so, we are bound by the interpretive framework *Moran* articulates.

¶ 66. Testing at taxpayer expense under Wis. STAT. § 974.07(7)(a), however, requires that additional statutory hurdles be met. And that determination is entrusted to the discretion of the trial court. The majority holds that the trial court erroneously exercised its discretion in concluding that Denny is not entitled to State-funded testing. I disagree.

### Reasonably Probable that Denny Would Not Have Been Convicted

¶ 67. Whether discretion has been appropriately exercised rests in part on the meaning of whether "[i]t is reasonably probable that the movant would not have been . . . convicted . . . if exculpatory [DNA] testing results had been available." Wis. STAT. § 974.07(7)(a)2.[2] While this may appear to be a straightforward test, in practice, it is not so clear at all.

¶ 68. To begin with, the language used does not readily lend itself to a determinate meaning. Attorneys often seek to quantify the advice they give. Is something thirty percent likely to occur? More likely than not (fifty-one percent)? Exceedingly likely (eighty to ninety percent)? While imprecise, it gives both lawyer and client something to work with—an analytical framework within which to make decisions. Something that is "probable" is, by standard usage, likely, or at

---

[2] I agree with the majority that Wis. STAT. § 974.07(7)(a)2. plainly requires that we assume the evidence is "exculpatory" —that is, evidence tending to establish innocence. *See* Majority, ¶ 57. The majority aptly defeats the State's attempt to have us add additional barriers for petitioners not derived from the text of the statute. *Id.*, ¶ 58.

least, more likely than not.[3] The adverb "reasonably" would seem to suggest that we are operating within the world of reasonable outcomes, rather than changing the meaning. But this is not self-evidently correct.

¶ 69. The second problem with this phrase is that it is legally loaded—probably intentionally so—seeming to incorporate another doctrinal framework. This is natural and good, of course; legislatures are presumed to know the law when they enact it. *Kenosha Cty. v. Frett*, 2014 WI App 127, ¶ 11, 359 Wis. 2d 246, 858 N.W.2d 397, *review denied*, 2015 WI 47, ¶ 1, 366 Wis. 2d 59, 862 N.W.2d 899. The problem is that the test in WIS. STAT. § 974.07(7)(a)2.—to the extent it is intended to calibrate to other bodies of case law—invokes two different bodies of law. The parties in this case debate which of these two we should adopt.

¶ 70. Denny suggests we use the doctrinal framework from the *Strickland* line of cases. *Strickland* requires that defendants show "there is a reasonable probability that . . . the result of the proceeding would have been different," and defines "reasonable probability" as one that is "sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The State, on the other hand, argues that this statute adopts the test from motions based on newly discovered evidence. In that line of cases, the question is "whether it is reasonably probable that, had the jury heard the newly discovered evidence, it would have had a reasonable doubt as to the defen-

---

[3] Black's defines "probable" as "[l]ikely to exist, be true, or happen." BLACK's LAW DICTIONARY 1395 (10th ed. 2014). According to Webster's, something is "probable" if it "is based on or arises from adequate fairly convincing though not absolutely convincing intrinsic or extrinsic evidence or support." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1806 (1993).

dant's guilt." *State v. Vollbrecht*, 2012 WI App 90, ¶ 18, 344 Wis. 2d 69, 820 N.W.2d 443.[4]

¶ 71. The majority likes the *Strickland* framework better. Majority, ¶ 49. The opinion credibly rests its conclusion on the fact that Wis. Stat. § 974.07 is, at least for purposes of § 974.07(7)(a), a postconviction discovery statute, and that the *Strickland* test is the one established by the supreme court in creating a right to postconviction discovery motions under the due process clause. Majority, ¶¶ 49–50; *State v. O'Brien*, 223 Wis. 2d 303, ¶ 24, 588 N.W.2d 8 (1999).

¶ 72. The amount of daylight between these two standards is difficult to quantify. In *State v. Edmunds*, 2008 WI App 33, ¶ 22, 308 Wis. 2d 374, 746 N.W.2d 590, we suggested that cases meeting one, but not the other standard, would be rare. Still, we acknowledged the prospect that a case could present "where our confidence in the outcome of a trial is undermined, and yet there is only a fifty-fifty or lower chance that the evidence would probably create reasonable doubt in a jury." *Id.* Thus, though the tests are proximate, the newly discovered evidence standard is higher and more akin to a more-likely-than-not inquiry, while the *Strickland* standard demands that defendants meet a lighter burden.

¶ 73. I decline to reach the question of the proper standard here because I conclude that the trial court

_____

[4] Courts sometimes use the phrase "reasonably probable" and sometimes use "reasonable probability." Though they appear to mean different things in colloquial usage— reasonably probable seems to mean reasonably likely, while reasonable probability seems to mean a likelihood that is "reasonable"—courts nonetheless use them interchangeably. *Compare, e.g., State v. Vollbrecht*, 2012 WI App 90, ¶ 18, 344 Wis. 2d 69, 820 N.W.2d 443, *with State v. McCallum*, 208 Wis. 2d 463, ¶¶ 16–18, 561 N.W.2d 707 (1997).

properly exercised its discretion under either standard. Yet, a further discussion of the appropriate standard may prove helpful in the event the supreme court wishes to address this question. The majority makes a compelling case for the *Strickland* standard. But there is also a compelling case for the State's argument that we should use the higher newly-discovered evidence standard.

¶ 74. In 2004, this court had occasion to assess a claim under this statute. In *Hudson*, we accepted the framing of the argument as "whether it is reasonably probable that exculpatory DNA testing results would raise a reasonable doubt about Hudson's guilt." *State v. Hudson*, 2004 WI App 99, ¶ 17, 273 Wis. 2d 707, 681 N.W.2d 316. This framing unequivocally invokes the newly discovered evidence test. *See* Majority, ¶ 48 (describing the outcome-determinative test on a motion for newly discovered evidence as querying whether there is a reasonable probability a jury would have reasonable doubt). The analysis and conclusion followed suit, looking at the proposed new evidence compared with the old evidence to determine whether it created "a reasonable probability of a reasonable doubt." *Hudson*, 273 Wis. 2d 707, ¶ 18. While the proper test may not have been an issue presented to the court, there is ample reason to follow the analysis in our prior decision.

¶ 75. Consistent with *Hudson*, the text of WIS. STAT. § 974.07(7)(a)2. itself seems more consonant with a fifty-fifty test than one requiring a lower hurdle. On its face, in normal usage, whether it is "reasonably probable" a defendant "would not have been . . . convicted" is best read as asking whether it is more likely than not that he would not have been convicted under a different set of facts.

402

¶ 76. Reading Wis. Stat. § 974.07 in context also provides support for the higher standard. The section as a whole provides a mechanism for obtaining both new evidence and potential relief based on that evidence; it even includes a textual connection with a motion for a new trial on the basis of newly discovered evidence under Wis. Stat. § 805.15(3). Section 974.07(10)(b) specifies that a court may order a new trial following testing without making two of the normal findings necessary under § 805.15(3). Notably, one finding that still appears to be necessary for the court to order a new trial under § 974.07(10) is that "[t]he new evidence would probably change the result." Sec. 805.15(3)(d). Thus, the statute has a certain symmetry. A movant seeking to discover new evidence all-expenses-paid under § 974.07(7)(a) must show that it is reasonably probable the conviction would not have occurred with that new evidence. Once the evidence is in, the court may only order a new trial upon a showing that the now-actual evidence would "probably change the result."

¶ 77. The majority's contrary conclusion relies in large part on the constitutional due process right to postconviction discovery. *See O'Brien*, 223 Wis. 2d 303, ¶ 24. The court in *O'Brien* adopted the *Strickland* test to ensure that the evidence sought is "material" so as to provide meaningful limits on this new process. *O'Brien*, 223 Wis. 2d 303, ¶ 24; Majority, ¶ 50. This is sound support for using the *Strickland* standard here.

¶ 78. On the other hand, a statutory scheme providing testing at State expense is not constitutionally required at all. Wis. Stat. § 974.07 goes above and beyond for criminal defendants by providing a statutory right to discovery at an even lower standard than

403

*Strickland*—mere relevance. Even more, the State offers to pay for scientific testing, but only if it meets the reasonably probable test. There simply is no constitutional right to state-paid-for DNA testing years after a conviction. This statute is, no doubt, motivated by a sincere effort to ensure those already convicted in years past have an opportunity for vindication through access to the latest scientific advancements. Still, it remains a legislative grace. It would be no surprise to think that the legislature would enact a slightly higher standard than materiality to trigger a state-subsidized investigation for the convicted defendant's benefit.[5]

¶ 79. Thus, the text itself, the statutory framework and context, and our decision in *Hudson* make a strong case that the test for obtaining state-funded DNA testing under WIS. STAT. § 974.07(7)(a)2. is best read as incorporating the test for newly discovered evidence: whether it is reasonably probable that exculpatory DNA testing results would raise a reasonable doubt about the convicted defendant's guilt. *Hudson*, 273 Wis. 2d 707, ¶ 17.

¶ 80. To reiterate, the majority's case for the *Strickland* standard is, in my view, just as strong, and maybe stronger. And absent review by our high court, it provides clear guidance to trial courts. But in the event the supreme court does ultimately answer this question, these compelling counter-arguments deserve a hearing.

---

[5] If in fact the supreme court revisits its determination in *Moran*, 284 Wis. 2d 24, ¶¶ 49–55, that WIS. STAT. § 974.07(6) provides a separate right to testing at private expense, this argument would be much weaker and would weigh more heavily in favor of the majority's position.

## The Trial Court Did Not Erroneously
## Exercise Its Discretion

¶ 81. Regardless of the test, this case, like so many, boils down to the standard of review. This court unambiguously held in *Hudson* that the question of whether the State must pay for testing under Wis. Stat. § 974.07(7)(a)2. is one entrusted to the discretion of the trial court. *Hudson*, 273 Wis. 2d 707, ¶ 16. The majority agrees this is the proper standard of review. *See* Majority, ¶ 31.

¶ 82. As noted above, I agree with the majority that the trial court's application of a heightened relevance test to deny Denny DNA testing at his own expense was error, and therefore was an erroneous exercise of discretion. Contra the majority, I conclude that the trial court properly exercised its discretion in determining whether the exculpatory evidence would make it reasonably probable that a jury would not have convicted Denny.

¶ 83. The trial court concluded that DNA testing would not make it reasonably probable that Denny is guilty of being party to the crime of murder even if testing showed one or multiple other individuals were involved. The trial court reasoned that this killing was never presented as a single-perpetrator crime and that Denny himself alleged as many as seven people were involved in the murder. And since the jury was only asked if Denny was party to the crime of murder, testing revealing the identity of others who may have been involved would not have changed the jury's mind. The trial court's reasoning is sound, supported by the record, and probably correct.

¶ 84. Denny was not convicted because of a single eyewitness or a dubious confession since retracted. No, the trial court noted that Denny was

convicted on the strength of thirty-six—*thirty-six*—inculpatory statements made by Denny or his brother to different people, at different times, and in different places. Just a brief summary of the evidence shows that his conviction rests on a firm foundation.

¶ 85. Denny confessed to his brother Trent and discussed the murder on multiple occasions. Trent, Kent, Denny, and Lori Jocque went on a special spoliation outing—to the graveyard no less—to dispose of the clothes used during the murder. Trent even saw the clothes with blood on them. Denny told his brother Trent about his efforts to hide the murder knife, which Trent saw. In addition to his brother Trent, Denny confessed to Lori Jacque, who corroborated Trent's story regarding disposal of the murder clothes, testified that Denny discussed a scratch on his leg where the victim scratched him, and later heard them further discuss their failure to dispose of the shoes they wore during the murder. Denny also confessed his involvement in the murder to his girlfriend, Tammy Whitaker, on two separate occasions. Denny confessed to another friend, Patricia Robran, with weeping tears, that he killed "the boy in Grafton" by stabbing him as many as fifteen times. Denny confessed to Steve Hansen that he and Kent killed Christopher Mohr. Denny even confessed to his cellmate at the jail that he participated in Mohr's murder. Denny told another friend, Russell Schram, about the "murder shoes," which were later found to be a similar tread pattern to that found at the murder scene, and about how long it takes a person to die. Denny lamented on more than one occasion that all he got out of the murder was a quarter-pound of marijuana; Jonathan Leatherman testified that this was the amount missing from what he and the victim

had purchased. This is to say nothing about Kent's corroborating admissions to at least five separate individuals.

¶ 86. The evidence was vast, overwhelming, and damning. It was not even close. Furthermore, the jury did not have to find that he personally killed Mohr; Denny was convicted as party to the crime.

¶ 87. In my view, the trial court got it right. Assuming DNA test results showed no blood from Denny and evidence from some other third party or parties, I conclude that a reasonable jury looking at both the old and new evidence would be unlikely to have reasonable doubt as to Denny's guilt as party to a crime. Similarly, using the majority's *Strickland*-like test, my confidence in the outcome would not be undermined even assuming exculpatory testing results.

¶ 88. The majority concludes not that the trial court got it wrong, but that it erroneously exercised its discretion in so finding. This is unconvincing, to say the least. All that is necessary for a proper exercise of discretion is for the trial court to rely on the facts of the record and the applicable law[6] to reach a *reasonable* conclusion—not necessarily the conclusion this court would reach given the same facts. *Hudson*, 273 Wis. 2d 707, ¶ 16. Even if reasonable people may disagree about whether there is a reasonable probability of a different result, it is hard to say that the trial court's conclusion here is patently unreasonable.

---

[6] The trial court did not undertake to determine which "reasonably probable" test to apply. Rather, it used the words of the statute itself in rendering its ruling. Our clarifications of the test notwithstanding, I do not think the record makes clear the trial court applied an "improper standard of law," as the majority alleges. Majority, ¶ 59.

## Conclusion

¶ 89. In sum, I would reverse the trial court and permit testing at Denny's expense under WIS. STAT. § 974.07(6). And, regardless of the proper "reasonably probable" standard for determining whether testing is authorized at taxpayer expense under § 974.07(7)(a)2., I would uphold the trial court's exercise of discretion in concluding that Denny did not meet this standard.