¶ 131.
ANN WALSH BRADLEY, J.
{dissenting). One of the essential tenets of our criminal justice system is that the "administration of justice is and should be a search for the truth." Garcia v. State, 73 Wis. 2d 651, 655, 245 N.W.2d 654 (1976). It is undisputed that DNA testing is "one of the most significant scientific advancements of our era" and the most powerful technology we have for revealing the truth. Maryland v. King, 133 S. Ct. 1958, 1966 (2013).
¶ 132. Making several missteps along the way, the majority limits the contours of this search. Dedicating almost half of its lengthy opinion to an exposition of the facts, it emphasizes the strong evidence of Denny's guilt as a reason to circumscribe his ability to conduct DNA testing. Of course there is strong evidence of guilt. Denny, as well as the multitude of *449 convicted persons who have been exonerated after DNA testing, were all found guilty beyond a reasonable doubt.
| 133. The question is not whether there is strong evidence of guilt. Rather, the question is whether the legislature has written a statute that gives Denny the opportunity to test evidence that has the potential to exonerate him. More precisely, at issue in this case is whether Wisconsin's post-conviction DNA testing statute allows a defendant to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction.
¶ 134. This same question was answered eleven years ago, when this court unanimously determined that the plain meaning of the post-conviction DNA testing statute "gives the defendant the right to test the sought-after evidence ...." State v. Moran,, 2005 WI 115, ¶ 57, 700 N.W.2d 884. Nothing in the DNA testing statute has changed in the decade since this court decided Moran, nor has the State presented any evidence that the statute has been unworkable in practice. The only thing that has changed is the composition of this court.
¶ 135. In reaching its conclusion, the Moran court issued an invitation to the legislature. See id., ¶ 56 ("We encourage the legislature to revisit Wis. Stat. § 974.07 . . . ."); see also id., ¶ 59 (Wilcox, J. concurring) (" . . . I strongly urge the legislature to take a hard look at the practical consequences of [subsection (6)].").
¶ 136. The legislature did not respond to the invitation. Throwing caution (as well as any semblance of judicial restraint) to the wind, the majority steps in to perform the legislature's job.
*450 ¶ 137. It now overrules Moran and runs roughshod over the fundamental doctrine of stare decisis. To justify overturning unanimous precedent, the majority unearths a heretofore unknown test which it labels "principles of policy." Majority op., ¶ 71. Apparently not very convinced of the legitimacy of its own discovery, the majority obscures the application of the new test by tucking it away in a footnote. Id., ¶ 70 n.16.
¶[ 138. In overruling Moran, not only does the majority apply a test that courts have never before used, it also attempts to justify its action by relying on an "imagine[d]" purpose that the legislature never stated. Garnering a trifecta of "nevers," it then embarks upon rewriting the plain meaning of Wis. Stat. § 974.07 by inserting a limitation that the legislature never created.
¶ 139. Ultimately, the majority arrives at a determination that pursuant to Wis. Stat. § 974.07(6), all Denny can do is look at evidence with the naked eye when its potential to exonerate him is invisible until it is tested. Id., ¶ 71. Such a useless procedure renders the majority's determination absurd.
f 140. The majority further missteps when it deprives Denny of the opportunity to test for potentially exculpatory evidence under an alternative statutory procedure. Whether analyzed under Wis. Stat. § 974.07(6) or (7), the majority impedes the search for the truth by erroneously limiting access to post-conviction DNA testing.
¶ 141. Contrary to the majority, I would adhere to this court's unanimous decision in Moran. The plain meaning of Wis. Stat. § 974.07(6) gives the defendant the right to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction. In *451 the alternative, I conclude that Denny has met the requirements under Wis. Stat. § 974.07(7)(a) for post-conviction DNA testing.
¶ 142. Accordingly, I respectfully dissent.
I
¶ 143. This court follows the doctrine of stare decisis "scrupulously because of our abiding respect for the rule of law." Johnson Controls Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶ 94, 264 Wis. 2d 60, 665 N.W.2d 257. A court's decision to depart from precedent is not to be made casually and we should not depart from precedent without sufficient justification. Id.
¶ 144. In this case "stare decisis carries enhanced force" because this court's decision in Moran interpreted a statute. See Kimble v. Marvel Ent., LLC, 135 S. Ct. 2401, 2409 (2015) (without "special justification," the decision to correct statutory interpretation should be left to the legislature); see also State v. Lynch, 2016 WI 66, ¶¶ 208-209, 371 Wis. 2d 1, 885 N.W.2d 1 (Ziegler, J., dissenting) ("[I]t is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a 'special justification'—over and above the belief "that the precedent was wrongly decided.") (quoting Kimble, 135 S. Ct. at 2409).
A
f 145. By overruling Moran, the majority disregards the fundamental principle of stare decisis and manufactures a heretofore unknown test for overturning precedent.
¶ 146. According to the majority, its decision to overrule Moran is justified because stare decisis is a " 'principle of policy,' rather than an 'inexorable com *452 mand.'" Majority op., ¶ 71 (citing Hohn v. United States, 524 U.S. 236, 251 (1998) (quoting Payne v. Tennessee, 501 U.S. 808, 828 (1991))). In Johnson Controls, this court explained what is meant by the phrase "principle of policy." Stare decisis is a "principle of policy" because it is "a policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be right.[1] " Johnson Controls, 264 Wis. 2d 60, ¶ 97.
¶ 147. In asserting that "sometimes stare decisis must yield to other important principles of policy," the majority blatantly mischaracterizes the law. Majority op., f 71. It transposes the single stated "principle of policy" underlying stare decisis (that settled law is of the utmost importance), into an unknown and potentially unlimited number of "principles of policy" that could justify overruling precedent. What are these principles? Whose are they? Are they legislative policies or policies that this court develops as the need arises?
¶ 148. Further, the majority fails to meet its newly minted "principles of policy" test because it does not offer a compelling policy reason for overturning Moran. Indeed, the one policy the majority identifies is one it admits is "not dispositive in the case at issue . . . ." Id., ¶ 70 n.16.
¶ 149. Apparently not convinced about the legitimacy of its principle of policy, the majority tucks it away in a footnote—asserting that overruling Moran is "the best way to protect the rights and interests of crime victims in Wisconsin." Id., ¶ 70 n.16.
¶ 150. The majority's footnoted justification for overruling Moran is at odds with the rational offered by now-governor Scott Walker who co-authored this legislation. In an interview, then former state repre *453 sentative Scott Walker explained that post-conviction DNA testing is focused on keeping us all safe—victims and the public alike:
Whether it's proving someone's guilt or someone's innocence, in either case, it keeps us safer because if somebody is innocent, that means somebody who's guilty is still out there, and we can use that evidence to get them off the streets.[1]
¶ 151. Unsurprisingly, there is nothing in the record indicating that victims have suffered any more harm since Moran was decided. Faced with this void in the record, the majority resorts to imagination: "it is not difficult to imagine why such testing might cause significant distress to victims . . . ." Majority op., ¶ 70 n.16.
¶ 152. Based on this speculation, supported and advanced by its collective imagination, the majority divines a "principle of policy" in its attempt to justify overruling Moran. It concludes that upholding Moran "would be purposefully perpetuating a much more expansive postconviction forensic DNA testing regime than the legislature saw fit to enact, to the possible detriment of Wisconsin crime victims." Id., ¶ 70 n.16.
¶ 153. The rights and interests of crime victims are undeniably important considerations, which the legislature has already addressed through the notice provisions in Wis. Stat. § 974.07(4).[2] However, relying *454 on an "imagined" policy reason to limit the availability of DNA testing strays too far from subsection (4)'s victim-notification mandate. See State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶ 48, 271 Wis. 2d 633, 681 N.W.2d 110. There is nothing in the text of the statute that suggests the legislature intended to limit post-conviction DNA testing due to the speculative concerns the majority identifies here.
¶ 154. Contrary to the majority's assertions, allowing DNA testing does not undermine finality or lead to "the possibility of 'inequitable results' " due to "opening] up cases that have long been thought by everyone, including crime victims, to be final." Majority op., ¶ 70 n.16 (citation omitted). Performing DNA testing on relevant evidence is only the first step in a process where the defendant must next demonstrate that the results of the testing support his claim. See Moran, 284 Wis. 2d 24, ¶ 47 (allowing DNA testing does not guarantee a new trial or even an evidentiary hearing).
¶ 155. If the DNA test results do not support a defendant's claim, the case is not reopened. And if the DNA testing results do support a defendant's claim of innocence, victims will have little interest in finality if the true criminal perpetrator is still at large. See majority op., ¶ 70 n.16.
¶[ 156. Likewise, there is no evidence that post-conviction DNA testing has led to "inequitable results." If the majority intends to speculate that post-conviction DNA testing might lead to the "possibility" of wrongfully exonerating a criminal defendant, it has a very steep hill to climb. The State has introduced no evidence that legitimate convictions have been over *455 turned. Additionally, courts have widely acknowledged that DNA testing is unparalleled in its ability to exonerate the wrongly convicted and identify the guilty. Maryland v. King, 133 S. Ct. at 1966.
B
¶ 157. Turning away from the majority's newly created "principles of policy" test and instead considering the well-established criteria this court has always applied in determining whether it may overrule precedent, it becomes clear why the majority saw the need to create a new test justifying its decision. This case satisfies none of the well-established criteria that would warrant departing from the doctrine of stare decisis and overruling Moran.
¶ 158. In Johnson Controls, we identified several criteria in Wisconsin for overruling our prior cases: (1) if "changes or developments in the law have undermined the rationale behind a decision"; (2) "there is a need to make a decision correspond to newly ascertained facts"; or (3) "there is a showing that the precedent has become detrimental to coherence and consistency in the law." 264 Wis. 2d 60, ¶ 98. We explained further that other "relevant considerations in determining whether to depart from stare decisis are whether the prior decision is unsound in principle, whether it is unworkable in practice, and whether reliance interests are implicated." Id., ¶ 99.
¶ 159. Addressing the first two factors, the majority argues that the Moran court did not consider Wis. Stat. § 974.07(12) in reaching its analysis. Majority op., ¶ 70 (citing Johnson Controls, 264 Wis. 2d 60, ¶ 98). According to the majority,' [r] econsideration of the statute with the benefit of a clear understanding of [subsec *456 tion (12)] convinces us that our interpretation of sub. (6) must be modified to take account of sub. (12)." Id.
¶ 160. The majority's analysis suffers from a glaring mistake. Subsection (12) was a part of the statute at the time Moran was decided and has not been changed in the interim. Although the majority may place a different emphasis on subsection (12) than did the Moran court, it would be meaningless to require "changes or developments in the law" if those changes originate from only this decision. Likewise, there are no newly ascertained facts in this case aside from the majority's new interpretation of the statute.
¶ 161. Equally flawed are the majority's unsubstantiated claims that Moran's interpretation of Wis. Stat. § 974.07(6) has "become detrimental to coherence and consistency in the law," that it has rendered "the rest of the statute incoherent in a manner we obviously did not contemplate in Moran," and that it is "unsound in principle." Id. (citing Johnson Controls, 264 Wis. 2d 60, ¶¶ 98-99).
¶ 162. The sole justification the majority offers here is that "allowing testing under sub. (6) would require only the barest of showings." Id., ¶ 66. According to the majority, it is "difficult to believe that the statute is most properly read to permit convicted offenders who are unable to meet the surmountable sub. (7) standard to engage in postconviction fishing expeditions in attempts to cast doubt upon and upset those convictions." Id.
f 163. The majority's prospective concerns carry little weight when there is no evidence that Moran's interpretation of the statute has lead to frivolous requests for testing over the last decade. Indeed, the State has offered no evidence that it has been over *457 whelmed by demands for post-conviction DNA testing or that legitimate convictions have been overturned.
¶ 164. At oral argument, Denny's counsel explained that the Wisconsin Innocence Project "probably does the vast majority, if not almost all of the post-conviction DNA testing in this State."[3] Counsel affirmed that there are very few post-conviction motions for DNA testing filed each year, explaining that "we're talking about a handful of cases each year. There's no overwhelming burden on the system. It's a handful of cases."
¶ 165. Contrary to the majority's assertions, there is no evidence that Moran's interpretation of the post-conviction DNA testing statute is incoherent or inconsistent in ways that have become detrimental to the law. In fact, it appears that the current statutory scheme has worked well for both defendants and the State.
f 166. Post-conviction DNA testing pursuant to subsection (6) avoids litigation and saves judicial resources because a defendant does not need a court order to test evidence. Additionally, it saves the State the cost of paying for the testing and relieves the State from having to acknowledge that the defendant has met the reasonably probable standard set forth in Wis. Stat. § 974.07.
*458 ¶ 167. Given the legal and logical gymnastics the majority performs in order to justify overruling Moran, one would hope that its decision at least advances a sound interpretation of the statute. Unfortunately, such hope is unrealized.
II.
¶ 168. By rewriting Wis. Stat. § 974.07, the majority inserts a limitation the legislature never created and arrives at an unreasonable and absurd result.
¶ 169. In Moran, this court determined that if a defendant met the threshold requirements set forth in Wis. Stat. § 974.07(2), he had two avenues for pursuing post-conviction DNA testing.[4] 284 Wis. 2d 24, ¶ 55. Moran explained that "the statutory text makes clear that subsections (6) and (7) are intended for different purposes." Id. Subsection (6) allows a defendant access to test results and evidence containing biological material, but he must decide whether to test the material and pay for the testing himself.[5] Id. Subsection (7) pertains to court-ordered testing at the State's expense. Id.[6]
*459 ¶ 170. The majority does not dispute that "it is possible to read § 974.07 as creating two systems for testing at private expense (under subs. (6) and (12)) and one system for testing at public expense (under sub. (12))..." Majority op., ¶ 67.[7] However, it over *460 rules Moran because "we do not find this to be the most sensible interpretation of the statute." Id.
¶ 171. Contrary to Moran, the majority now concludes that all motions for post-conviction DNA testing must proceed by court-order under Wis. Stat. § 974.07(7). Id., f 68. Additionally, the majority determines that Wis. Stat. § 974.07(6) allows a defendant with only the naked eye to look at, but not test, relevant evidence containing biological material. Id.
¶ 172. Not only are the majority's complaints about Moran unpersuasive,[8] its analysis violates a basic premise that it is the legislature that writes the statutes—not the courts. The majority usurps the *461 legislature's role when it writes its own inspection limitation into subsection (6) that prohibits DNA testing of evidence.[9]
¶ 173. In contrast, the Moran court explicitly declined to "add language to the statute in order to justify the State's interpretation." Moran, 284 Wis. 2d 24, ¶ 39. After careful analysis, the Moran court determined that "[w]e are unable to discern from the plain language of § 974.07 a clear legislative intent to block testing demanded by a person willing and able to pay until that person satisfies the requirements for publicly funded DNA testing." Id., ¶ 54.
f 174. Additionally, the majority violates a well-established canon of statutory construction that we interpret statutes "reasonably, to avoid absurd or unreasonable results." Kalal, 271 Wis. 2d 633, ¶ 46. The majority's interpretation of the statute, unlike the interpretation set forth in Moran, leads to an absurd and unreasonable result because without DNA testing, the ability only to look at evidence containing biological material is essentially useless.
¶ 175. Apparently recognizing this fundamental flaw in its reasoning, the majority asserts that "the facts in the case at issue demonstrate why inspection is useful." Majority op., ¶ 71 n.17. It then explains that in his supplemental motion for post-conviction DNA *462 testing, Denny reviewed the physical evidence on file and identified additional relevant items that were previously overlooked. Id. Thus, according to the majority, "the ability to inspect allows one to ascertain what, if any, testing should be sought." Id.
¶ 176. Contrary to the majority's explanation, the facts of this case demonstrate the futility of examining evidence without being able to test it. Although Denny identified additional relevant items that were overlooked, there is nothing he can do with that evidence.
¶ 177. According to the maj ority, he can no longer test the evidence at his own expense pursuant to subsection (6) and the majority has denied his claim for court-ordered testing pursuant to subsection (7). All Denny can do is look at the evidence when its potential to exonerate him is invisible until it is tested. This is an absurd and unreasonable result that contravenes the plain language of the statute.
II I
¶ 178. Finally, I address the majority's conclusion that Denny's motion for post-conviction testing does not entitle him to court-ordered testing pursuant to Wis. Stat. § 974.07(7)(a)2. According to the majority, Denny has failed to meet the reasonably probable standard. It determines that "[e]ven if exculpatory DNA testing results were available before prosecution and conviction, we are unable to conclude that it is reasonably probable that Denny would not have been prosecuted or convicted because of his crime." Id., ¶ 81.
¶ 179. The majority begins by correctly stating that for the purposes of this analysis, we are to assume that if DNA testing were to occur, the results would be *463 exculpatory. Id., f 76. It errs, however, when it denies Denny the opportunity to test potentially exculpatory evidence by failing to acknowledge how the witness testimony could be undermined by exonerating DNA-evidence.
¶ 180. Rather than analyze the testimony against Denny in the context of exculpatory physical evidence, the majority rests its analysis on the broad assertion that "[t]he evidence incriminating Denny was, to put it mildly, extensive." Id., ¶ 77; see also id., ¶ 81 (citing State v. Denny, 2016 WI App 27, ¶ 86, 368 Wis. 2d 363 (Hagedorn, J., concurring in part and dissenting in part) ("As put by the separate writing below, '[t]he evidence was vast, overwhelming, and damning. It was not even close.'")).
¶ 181. Although the majority opinion begins with an expansive exposition of facts, its analysis relies on a brief summary of the conflicting testimony of multiple unreliable witnesses in denying Denny's motion for testing. According to the majority, "[tjestimony indicated that Denny confessed, made inculpatory statements to, and took inculpatory actions in front of, multiple witnesses." Id., ¶ 77.
¶ 182. The majority's reliance on the "extensive" and "overwhelming" evidence presented against Denny is misplaced. It ignores the reality that by definition his conviction was premised on strong evidence of guilt. Denny, like all convicted persons who have been exonerated after DNA testing, was found guilty beyond a reasonable doubt. Additionally, the majority ignores the ways that witness testimony is undermined by exonerating DNA-evidence.
¶ 183. Denny argues that three types of DNA test results would create a reasonable probability of a different result: (1) DNA that matches a convicted *464 offender; (2) DNA that excludes Denny and his brother Kent on all items; or DNA on multiple items matching the same unknown third party ("redundant DNA").
¶ 184. The majority dispenses with a DNA result that matches a convicted offender or multiple items matching the same unknown third party by agreeing with the circuit court that "Mohr's killing has never been presented as a single-perpetrator crime ..." Id., ¶ 78. Although this is true, the vast majority of the evidence against Denny was testimony in which Denny and Kent were the only perpetrators. In a handful of accounts, an individual named Leatherman was also implicated.
¶ 185. Contrary to the majority's assertion, DNA evidence matching an unknown third party or a convicted offender would undermine every piece of testimony in which Denny and Kent were presented as the only two perpetrators of the crime. The majority does not acknowledge this possibility. Instead it speculates that if more than one person committed the crime, finding a third person's DNA could not change the result because any number of people could have committed the crime in addition to Kent and Denny.
¶ 186. Further, the majority contends that the absence of DNA belonging to Denny and Kent would not be "particularly compelling." Id., ¶ 78. The majority dismisses the effect of exculpatory evidence excluding both Denny and Kent because there was no single account of what transpired in this case and various inconsistencies among the accounts of the witnesses. As discussed above, however, Denny and Kent were implicated in every account of the crime.
¶ 187. Excluding both brothers would undermine all of the testimony introduced against Denny in which both brothers played a role in the crime. Given the *465 obvious struggle and the violent crime scene in which evidence containing DNA was spread throughout the bedroom and into the hallway, it is reasonably probable that the result at trial would have been different if there was no physical evidence connecting Denny and Kent to the crime.
¶ 188. The majority even contends that the "various inconsistencies between the accounts of the witnesses actually serves to insulate Denny's conviction." Id., ¶ 78. This strains credulity, given the fact that the witnesses were unreliable in various ways, admitting to drug and alcohol use at relevant times and given grants of immunity so that they would testify. Rather than weigh the effect of exculpatory DNA evidence against this unreliable testimony, the majority contends that it is not persuaded by this argument because the jury was not. Id., f 80. This ignores the essential fact that the jury, in weighing the testimony of the witnesses, was not presented with exculpatory DNA evidence.
¶ 189. Ultimately, the majority's summary of conflicting testimony does not support its conclusion. Given the various inconsistencies in the testimony from unreliable witnesses, it is reasonably probable that exculpatory DNA results would have lead to a different outcome.
> HH
¶ 190. In sum, the majority opinion offers no persuasive legal, logical or factual reason for its decision to overrule Moran. Instead it discards the doctrine of stare decisis, unearths a test never before used to justify overruling precedent, "imagine [s]" a statutory purpose, rewrites the statute and ultimately ends with an absurd result. And for what?
*466 ¶ 191. As we learned at oral argument, only a handful of motions for post-conviction DNA testing are filed each year. But for the handful of potentially innocent people, the majority's decision limiting access to post-conviction DNA testing is devastating.
¶ 192. Daryl Dwayne Holloway's recent exoneration provides a compelling example of how Moran's interpretation of the statute worked well in practice for both the State and defendants. On October 5, 2016, three weeks before oral argument in this case, Holloway was exonerated based on new DNA evidence after spending 24 years in prison. At the request of counsel, the State reviewed the evidence against Holloway and agreed to DNA testing pursuant to Wis. Stat. § 974.04(6)(a). "In collaboration with the District Attorney's Office, the Wisconsin Innocence Project had new DNA testing done." The testing results exonerated Holloway and "[t]he Milwaukee District Attorney's office and the Wisconsin Innocence Project drafted a stipulation agreeing that Holloway's conviction should be vacated .. . ."[10]
¶ 193. The prosecutors were praised for taking on the case and serving as "ministers of justice, not just advocate[s] for convictions."[11] Given the majority's approach, no such accolades are deserved here.
¶[ 194. If the majority opinion were the law when prior exonerees sought post-conviction DNA testing, who knows if some would still be serving time in prison for crimes they never committed. Rather than retain *467 ing an established statutory pathway enabling a search for the truth, the majority blocks it and provides yet another avenue for sustaining convictions— even potentially wrongful convictions.
¶ 195. Before a jury begins its deliberations, the circuit judge instructs: "Let your verdict speak the truth, whatever the truth may be." Such an instruction falls on the deaf ears of the majority. By erroneously limiting access to post-conviction DNA testing, it impedes the criminal justice system's search for truth.
¶ 196. Contrary to the majority, I would adhere to this court's unanimous decision in Moran. The plain meaning of Wis. Stat. § 974.07(6) gives the defendant the right to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction. Additionally, the majority errs when it denies Denny the opportunity to test potentially exculpatory evidence by failing to acknowledge how the witness testimony could be undermined by exonerating DNA-evidence.
¶ 197. Accordingly, I respectfully dissent,
f 198. I am authorized to state that SHIRLEY S. ABRAHAMSON joins this dissent.

 Dee J. Hall, Nine people freed on strength of DNA testing in Wisconsin, WisconsinWatch.org, Dec. 13, 2009, http:// wisconsinwatch.org/2009/12/nine-people-freed-on-strength-of-dna-testing-in-wisconsin/.

 Pursuant to Wis. Stat. § 974.07(4)(a), if a motion for post-conviction DNA testing is made under sub. (2), the circuit court shall send a copy of the motion to the victim. Likewise, if *454 a hearing on the motion is scheduled, a notice of the hearing shall be sent to the victim. Wis. Stat. § 974.07(4)(a).

 The Wisconsin Innocence Project (WIP) is a clinical legal education program that is part of the Frank J. Remington Center at the University of Wisconsin Law School. It seeks to "exonerate the innocent, educate students, and reform the criminal justice system by identifying and remedying the causes of wrongful convictions." Wisconsin Innocence Project, University of Wisconsin Law School, http://law.wisc.edu/fjr/ clinicals/ip/index.html.

 Wis. Stat. § 974.07(2) provides in relevant part that a defendant may bring a motion for an order requiring DNA testing if the evidence: (a) is relevant to the investigation or prosecution that resulted in the conviction; (b) is in the actual or constructive possession of a government agency; and (c) has not been previously subject to DNA testing or, if it has been previously tested, it may now be tested again using a technique not previously available or utilized and that provides a reasonable likelihood of more accurate and probative results.

 Wis. Stat. § 974.07(6)(a) provides in relevant part:
*459 (6)(a) Upon demand the district attorney shall disclose to the movant or his or her attorney whether biological material has been tested and shall make available to the movant or his or her attorney the following material:
[[Image here]]
2. Physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological materials.

 Wis. Stat. § 974.07(7)(a) provides in relevant part:
A court in which a motion under sub. (2) is filed shall order forensic deoxyribonucleic acid testing if all of the following apply:
1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).
2. It is reasonably probable that the movant would not have been prosecuted [or] convicted ... if exculpatory deoxyribonucleic acid testing results had been available before the prosecution [or] conviction ...
Wis. Stat. § 974.07(7)(b) provides in relevant part:
A court in which a motion under sub. (2) is filed may order forensic deoxyribonucleic acid testing if all of the following apply:
1. It is reasonably probable that the outcome of the proceedings that resulted in the conviction. . . would have been more favorable to the movant if the results of deoxyribonucleic acid testing had been available before he or she was prosecuted [or] convicted .. .

 The payment of costs for post-conviction DNA testing are set forth in Wis. Stat. § 974.07(12). Subsection 12(a) provides that a court "may order a movant to pay the costs of any testing *460 ordered by the court under this section if the court determines that the movant is not indigent." Subsection (12)(c) provides that "[t]he state crime laboratories shall pay for testing ordered under this section... if the court does not order the movant to pay for testing."

 The majority asserts that Moran erred in its statutory interpretation because:
• Subsection (6) says nothing about allowing the movant to conduct forensic testing or sending the evidence away for testing. Majority op., ¶ 64.
• Moran did not discuss subsection (12). Id., ¶ 67.
• Subsection (6) does not reference testing by "court order" like other subsections in the statute. Id., ¶ 68.
Each of these points are easily rebutted:
• Even the majority acknowledges that "sub. (6) does not explicitly prohibit a movant from testing evidence, either." Id., ¶ 64.
• Moran harmonized subsection (12) with subsections (6) and (7) when it determined that one provided for private payment of costs and the other provided for public payment of costs. See 284 Wis. 2d 24, ¶ 57.
• There is no reason why DNA testing must proceed by court-order unless the court is ordering the State to conduct and pay for the costs of that testing.

 Not only does the majority fail to exercise deference to the legislature, its decision in this case is out of step with the legislature's commitment to utilizing DNA testing. For example, the legislature recently enacted 2013 Wis. Act 20, which expanded the collection, analysis, and maintenance of DNA samples as part of a larger initiative to expand the State's DNA databank. See, e.g., Wis. Stat. § 165.77(2)(a)1&3 (setting forth the requirement that the DOJ provide for the analysis of collected samples and maintain a state DNA databank).

 Innocence Project, Daryl Dwayne Holloway, http://www. innocenceproject.org/cases/daryl-dwayne-holloway/.

 Ashley Luthern, Milwaukee man exonerated by DNA after 24 years in prison, Milwaukee Journal Sentinel, Oct. 5, 2016, http://www.jsonline.com/story/news/crime/2016/10/05/milwaukee -man-exonerated-dna-after-24~years-prison/91615854/.