STATE of Wisconsin, Plaintiff-Respondent,

v.

Kenneth A. HUDSON, Defendant-Appellant†.

Court of Appeals

*No. 03–2083–CR. Submitted on briefs April 6, 2004.—Decided April 27, 2004.*

**2004 WI App 99**

(Also reported in 681 N.W.2d 316.)

†Petition for Review denied 9-16-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *David D. Cook* of Monroe.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Jeffrey J. Kassel*, assistant attorney general.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J. Kenneth Hudson appeals orders denying him independent and court-ordered postcon-

viction deoxyribonucleic acid (DNA) testing of various items. He argues the trial court erred by concluding WIS. STAT. § 974.07(6)[1] did not allow him to independently test physical evidence in the State's possession that contains biological materials. Because the State concedes the trial court erred by construing the statute to prevent independent testing of certain items at Hudson's expense, subject to protective conditions imposed by the trial court, we reverse the order entered March 25, 2003. Hudson also claims the trial court erred by refusing to order the items be tested under § 974.07(7)(a). Because we agree with the trial court that Hudson has not shown a reasonable probability he would not have been convicted if the exculpatory DNA testing results had been available before, we affirm the order entered July 16, 2003.

### BACKGROUND

¶ 2. On June 25, 2000, David Carnot was working in his yard when he heard a woman screaming. He ran through a wooded area toward the source of the screams. When Carnot arrived at Plank Road, he saw a man, later identified as Hudson, hanging onto an opened truck door, standing over a woman later identified as Shanna Van Dyn Hoven. Carnot, who was carrying a garden rake, came down the roadside and yelled, demanding to know what was going on.

¶ 3. Hudson jumped into his truck, put it into gear, accelerated, and drove straight at Carnot. Carnot ran and tried climbing a nearby fence, but Hudson's truck slammed into the fence before Carnot cleared the top. The impact caused Carnot to fall on top of the

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

truck, from which he then jumped over the fence and ran into a nearby quarry. After freeing the truck from the fence's tangle, Hudson sped away down Plank Road. Carnot returned to the roadside and saw Van Dyn Hoven lying in a pool of blood. By that time, she had stopped moving and was no longer breathing. Carnot ran to a neighbor's house and they called 911.

¶ 4. Melvin Vanden Bloomer testified he heard a loud noise coming from Plank Road. He saw Hudson's truck approaching with a flat front driver's side tire. He saw Hudson throw something out of the window, which Vanden Bloomer shortly thereafter discovered was a bloody rag.

¶ 5. Sergeant Robert Patschke saw Hudson's truck traveling on a highway, noticed the flat tire, and turned his vehicle around to investigate. As Patschke pursued Hudson's truck, Hudson did not slow down, but turned onto Highway 41 and accelerated. Patschke activated his siren and a chase ensued. After reaching speeds of 80–90 m.p.h., Hudson was finally forced to pull over where he was removed from the truck, escorted to the ground, and handcuffed. Patschke observed a blood-soaked passenger seat and a bloody knife laying on the floor beneath the brake pedal. Patschke also saw Hudson had blood on different parts of his body. Patschke placed Hudson in the back of the squad car. Fifteen minutes later, Patschke noticed Hudson was slouched on his side and hyperventilating, at which point an ambulance transported Hudson to a hospital.

¶ 6. Later that night, Hudson was transferred to the Kaukauna Police Department and interviewed by John Manion, the assistant chief of the Kaukauna Police Department, and lieutenant Kevin Shepardson. Hudson claimed he bought the knife to gut and clean some fish he recently caught. Manion indicated that

while Hudson first denied stabbing anyone, he later made several incriminating statements, including the incomplete sentence: "I got into an argument with a girl and I think I stabbed . . . ." Hudson said he fought with the girl who was running and tried to push her into the truck. After he forced her into the passenger side, Hudson reentered the truck but the girl got out. Hudson said he believed he stabbed her while she was in the truck.

¶ 7. Additionally, when Manion and Shepardson transported Hudson to the county jail, Hudson inquired what charges he was being booked for, and Manion indicated they would be homicide related because Van Dyn Hoven died as a result of the stab wounds. Manion testified Hudson started to yell and then cried and said, "Why did I stab her?" Manion testified Hudson then stated, "I didn't want for her to die. This is all because of my mother. I didn't even know her." After asking if Wisconsin had the death penalty, Hudson said his father and brother were looking down on him then, seeing what he had done.

¶ 8. State Crime Lab analyst John Ertl testified he performed DNA typing on various bloodstains: three from Hudson's truck, two from Hudson's person, and one from the knife. The blood from the knife and Hudson's vehicle was Van Dyn Hoven's. The bloodstain from Hudson's hand showed DNA from both Hudson and Van Dyn Hoven, while a stain from Hudson's left foot was not human.

¶ 9. The jury convicted Hudson of first-degree intentional homicide. Hudson later filed a postconviction motion pursuant to WIS. STAT. § 974.07 for independent or court-ordered DNA testing of ten items not previously tested: seven containing biological evidence in the form of blood, one item containing Hudson's

fingernail clippings, and two items containing Van Dyn Hoven's fingernail swabbings and scrapings. Hudson sought this evidence for two purposes. First, it would undermine the credibility of the police officers who testified to Hudson's "alleged" confession. Second, it would confirm a theory of Hudson's case: that he was the victim of a Kaukauna Police Department conspiracy that was covering up for the real killer, possibly the citizen-witness David Carnot, son of a recently retired sergeant of the Kaukauna Police Department. According to Hudson, he never had physical contact with Van Dyn Hoven, the police poured a Styrofoam cupful of animal blood on him (and then smeared it on his hands and chest) while he was sleeping in the back of a squad car after he was arrested, and the police either laced the knife "purportedly found" in Hudson's vehicle with the blood that soaked the truck's passenger seat or contaminated it with blood obtained during Van Dyn Hoven's autopsy.

¶ 10. The trial court concluded WIS. STAT. § 974.07(6) does not provide a defendant with the means for independent DNA testing. The court also denied Hudson's court-ordered testing request because it concluded Hudson could not establish a reasonable probability he would not have been convicted even if the additional DNA testing results were exculpatory. Hudson appeals.

### DISCUSSION

¶ 11. Hudson first argues that under WIS. STAT. § 974.07(6)(a), the State must "make available" physical evidence containing biological material for independent DNA testing. Subsection (6)(a) states:

> Upon demand the district attorney shall disclose to the movant or his or her attorney whether biological ma-

terial has been tested and shall *make available* to the movant or his or her attorney the following material:

1. Findings based on testing of biological materials.

2. Physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material. (Emphasis added.)

¶ 12. In the trial court, the State argued, and the court agreed, that Wis. Stat. § 974.07(6) did not compel the State to turn over evidence for independent DNA testing but only required the State to provide a movant access to review the material in order to determine which specific items he or she would like tested pursuant to a subsequent court order under subsection (7). On appeal, the State has reversed its position and concedes the trial court erred by construing the statute to prevent independent testing of certain items at Hudson's expense, subject to protective conditions imposed by the trial court. *See* Wis. Stat. § 974.07(6)(c) ("Upon motion of the district attorney or the movant, the court may impose reasonable conditions on availability of materials requested . . . in order to protect the integrity of the evidence."). We accept the State's concession and, therefore, do not address this issue further.

¶ 13. Hudson also argues he is entitled to court-ordered DNA testing under Wis. Stat. § 974.07(7)(a). Subsection (7)(a) requires the trial court to order DNA testing when the following four conditions are met:

A court in which a motion under sub. (2) is filed shall order forensic deoxyribonucleic acid testing if all of the following apply:

1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).

713

2. It is reasonably probable that the movant would not have been prosecuted, convicted, found not guilty by reason of mental disease or defect, or adjudicated delinquent for the offense at issue in the motion under sub. (2), if exculpatory deoxyribonucleic acid testing results had been available before the prosecution, conviction, finding of not guilty, or adjudication for the offense.

3. The evidence to be tested meets the conditions under sub. (2) (a) to (c).

4. The chain of custody of the evidence to be tested establishes that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the evidence, the testing itself can establish the integrity of the evidence.

The trial court found, and the State argues on appeal, that Hudson could not establish the second condition. In light of the overwhelming evidence supporting Hudson's guilt, the court concluded it was not reasonably probable that Hudson would not have been convicted even if the supposed "exculpatory" DNA testing results showed animal blood. We agree.

¶ 14. At the outset, however, we address the parties' dispute over the standard of review we should employ. Hudson advocates we should review this matter as a mixed question of law and fact, upholding the circuit court's findings of historical fact and reviewing the question of reasonable probability de novo, just as is done in ineffective assistance of counsel cases. *See State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996).

¶ 15. The State suggests a different approach. It analogizes this sort of case to those where a defendant seeks a new trial based on newly discovered evidence.

The State notes that in a newly discovered evidence case, a defendant must show there is a reasonable probability that a different result would be reached in a new trial. *See State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997). The State further observes that the supreme court in *McCallum* declined to undertake a "reasonable probability determination" after it concluded the trial court applied the wrong legal standard. The court stated: "Because the circuit court is in a better position to determine whether a reasonable probability exists that a reasonable jury looking at both the recantation and the original accusation would have a reasonable doubt as to McCallum's guilt, we defer this determination to the circuit court." *Id.* at 480. The State contends this language strongly implies that we should employ a deferential standard of review.

¶ 16. The State also calls attention to Chief Justice Abrahamson's concurrence in *McCallum*, where she concluded:

> On appellate review, I conclude that an appellate court should review the reasonable probability determination under the erroneous exercise of discretion standard. Having heard both the evidence at the original trial or hearing, or even just the evidence on the motion hearing, a circuit court is in a better position than an appellate court to determine whether confidence in the correctness of the outcome at the original trial or hearing has been undermined.

*Id.* at 491 (Abrahamson, C.J., concurring). We conclude this approach fits best. Therefore, we review the trial court's "reasonable probability" determination under Wis. Stat. § 974.07(7) under the erroneous exercise of discretion standard. A proper exercise of discretion requires that the trial court rely on facts of record and

the applicable law to reach a reasonable decision. *Martindale v. Ripp*, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. We now consider the substance of Hudson's argument.

¶ 17. Hudson notes WIS. STAT. § 974.07(7)(a)2 requires the circuit court to consider whether he has established, "It is reasonably probable that the movant would not have been . . . convicted . . . if exculpatory deoxyribonucleic acid testing results had been available before the . . . conviction." Thus, he claims the court must assume that DNA testing results would be exculpatory, and must determine how the exculpatory results would have affected the proceedings leading to a conviction considering all of the other evidence. Ultimately, Hudson notes the question is whether it is reasonably probable that exculpatory DNA testing results would raise a reasonable doubt about Hudson's guilt.

¶ 18. Hudson seeks to test ten items: seven containing biological evidence in the form of blood, one item containing Hudson's fingernail clippings, and two items containing Van Dyn Hoven's fingernail swabbings and scrapings. As to the items containing blood, Hudson claims if the tests show animal blood, his theory of the case—that Kaukauna police officers poured animal blood on him while he slept in the back of the squad car shortly after being arrested—would be supported, thus creating a reasonable probability of a reasonable doubt. As to the fingernail evidence, Hudson claims he never had physical contact with Van Dyn Hoven, contrary to the State's theory that he had a vigorous and prolonged struggle with her. Hudson claims the lack of Van Dyn Hoven's DNA under his fingernails and the lack of his DNA or the presence of another's DNA under Van Dyn Hoven's fingernails creates a reasonable probability of a reasonable doubt.

¶ 19. The trial court concluded Hudson had not met his burden because even if the test results would be as he speculates, given the overwhelming evidence of his guilt, there was not a reasonable probability he would not have been convicted. We agree.

¶ 20. Even if we assume that Van Dyn Hoven's DNA is not found on Hudson's fingernail clippings, and Hudson's DNA is not under Van Dyn Hoven's fingernails, and other blood tests positive for non-human blood, none of this adds up to a reasonable doubt in view of the overwhelming evidence of Hudson's guilt. Without detailing all of this evidence, we note that not only did Hudson confess to the stabbing on several occasions, albeit somewhat cryptically at times, Van Dyn Hoven's blood was found on the side of his vehicle, on his hand, and on a knife found in his truck.

■

¶ 21. Consequently, because Hudson has not established a reasonable probability that he would not have been convicted, the trial court did not erroneously exercise its discretion by denying Hudson's motion for court-ordered postconviction DNA testing. Therefore, the order entered July 16, 2003, is affirmed. However, in light of the State's concession, it must "make available" to Hudson the physical evidence containing biological specimens he has demanded for independent DNA testing at Hudson's expense, subject to protective conditions imposed by the trial court. Therefore, the order entered March 25, 2003, is reversed and the matter is remanded.

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded.