**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 21, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP591-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2000CF3635

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ANTONIO L. SIMMONS,

DEFENDANT-APPELLANT.

APPEAL from orders of the circuit court for Milwaukee County: WILLIAM S. POCAN and DAVID A. HANSHER, Judges. *Affirmed.*

Before Brash, P.J., Donald and White, JJ.

¶1 BRASH, P.J.  Antonio L. Simmons appeals an order from the circuit court denying his motion for postconviction deoxyribonucleic acid (DNA) testing

on several items of evidence, pursuant to WIS. STAT. § 974.07 (2017-18).[1] He also appeals orders denying his motion for reconsideration and his motion requesting supplemental briefing on his related due process argument regarding the items that were destroyed. We affirm.

## BACKGROUND

¶2 This matter dates back to a shooting that occurred in July 2000. Simmons got into an argument with J.S.G. at a tavern located at 42nd Street and Capitol Drive in the City of Milwaukee. During the altercation, J.S.G. hit Simmons over the head with a glass bottle. J.S.G. then left the tavern with his sister, P.S.G., and her friend, A.C., in P.S.G.'s car. They had just driven away from the tavern when a white car pulled up next to them at the intersection and started firing a gun into P.S.G.'s car. J.S.G. suffered multiple gunshot wounds to his chest, shoulder, and cheek, and P.S.G. had one gunshot wound to her upper right shoulder. A.C. was not hit.

¶3 After the shooting, the white car fled from the scene and was discovered shortly thereafter by responding officers eleven blocks from where the shooting had occurred. The only person officers saw near the vehicle— approximately twenty feet away from it—was Zakea Jones, who subsequently informed officers that she was dating Simmons. Jones initially told an officer that a man she knew as "C-Note" had fled from the vehicle. However, in a statement to police an hour and a half later, she told the investigating detective that it was Simmons who had fled from the car.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶4     In a search of the white car, officers recovered a .380 bullet casing inside the vehicle, along with several nine-millimeter casings that were found in the street.  Officers also found a small bottle of champagne, a larger bottle of brandy, and a baseball cap inside the vehicle, and a silk head wrap and two black shoes outside of the vehicle.

¶5     J.S.G., P.S.G., and A.C. all identified Simmons as the shooter and as the man with whom J.S.G. had the earlier altercation inside the tavern, from a photo array.  Two other witnesses–employees of the tavern who had broken up the fight between Simmons and J.S.G.—also identified Simmons as the shooter.

¶6     Simmons was subsequently arrested and charged with two counts of first-degree recklessly endangering safety while armed and one count of second-degree recklessly endangering safety while armed.

¶7     A jury trial was held in February 2001.[2]  Among the witnesses for the State, J.S.G. testified about the events that night.  He stated that the fight in the tavern started after J.S.G. was talking to a girl and Simmons—whom he did not know—pushed J.S.G. and then grabbed his head, ramming it into a wall; J.S.G. then hit Simmons with the bottle.  After J.S.G. left the bar with P.S.G. and A.C. in P.S.G.'s car, J.S.G. testified that the white car—driven by Simmons—pulled up next to them, and Simmons started shooting.  J.S.G. further stated that Simmons got out of his car and continued shooting into P.S.G.'s car, yelling for J.S.G. to "die" as he was shooting.  Additionally, P.S.G. and A.C. testified about the events of that night, and identified Simmons as the shooter.

_____

[2] The Honorable Robert Crawford presided over the trial and sentenced Simmons.  We refer to him as the trial court.

3

¶8      Also testifying on behalf of the State was Tyrone Ramsey, one of the tavern employees who had previously identified Simmons. He worked security at the tavern, and testified that he witnessed the fight between Simmons and J.S.G., both of whom he knew as regular patrons of the tavern. Ramsey stated that after he separated the two, he told J.S.G. to leave the bar, but kept Simmons inside until he felt J.S.G. had enough time to leave—approximately ten to fifteen minutes.

¶9      Ramsey testified that he saw Simmons get into the white vehicle. After Simmons had pulled away from the bar, he saw Simmons get out of his car at the intersection—approximately half a block away—and start shooting into the vehicle in which J.S.G. was a passenger. Ramsey stated that the intersection was well-lit, that there was nothing obstructing his view of the intersection, and that he had no doubt that it was Simmons who had shot into P.S.G.'s car.

¶10     One of the officers who investigated the shooting scene also testified. He stated that he recovered six .380 shell casings and one bullet from the scene. That evidence along with the other shell casings that were found in and around the white car were analyzed by the Wisconsin State Crime Lab; the findings were conclusive that the shell casings at the shooting scene were from the same gun as the casing found inside the white car.

¶11     Additionally, a detective who had interviewed Jones testified as well. On cross-examination, Simmons' trial counsel attempted to elicit testimony from the detective about Jones' statement that C-Note had fled from the white car. However, based on the evidentiary rule of completeness, the trial court ruled that if it permitted that statement, it would also allow testimony regarding her second statement to police that it was Simmons who had fled from the vehicle. Counsel opted not to pursue that line of questioning.

4

¶12    Simmons called as a witness his close friend John Lindsey, who was present at the tavern during the fight with J.S.G. Lindsey testified that Simmons left the tavern with him in his red Cutlass to go to the hospital to have the wound on Simmons' head treated. Lindsey testified that he saw gunfire coming from a white car, shooting at another vehicle, as they drove away from the tavern. Lindsey further stated that Simmons decided not to seek treatment at the hospital since he had an outstanding warrant.

¶13    The jury convicted Simmons of all three counts with which he was charged.

¶14    During the preparation of the presentence investigation report, Simmons told the presentence writer that Jones was actually the shooter. He submitted an affidavit from Jones confessing to the shooting, in which she explained that she had shot at the car out of fear because she had seen J.S.G. with a gun. She also averred that C-Note was in the vehicle with her at the time, not Simmons. As a result, Simmons moved for a new trial based on newly discovered evidence. The trial court denied the motion, noting that Simmons would have to address that issue in an appeal.

¶15    Simmons was sentenced in June 2001 to a total of twenty-six years of initial confinement and thirteen years of extended supervision. In discussing the factors it was considering for sentencing, the trial court noted that it found it "especially reprehensible" that Simmons was attempting to shift the blame to Jones, whom the court deemed to be "vulnerable and easy to manipulate[.]"

¶16    In February 2003, Simmons filed a postconviction motion seeking sentence modification on the grounds that his sentence was excessive, and that the trial court had relied on the assumption that Simmons had manipulated Jones into

claiming responsibility for the shooting, which was without basis. Simmons also filed a supplemental motion seeking a new trial in the interests of justice based on affidavits from two new witnesses who averred that Simmons got into Lindsey's red Cutlass on the night of the shooting, rather than the white vehicle which was involved in the shooting. Simmons' motions were denied without a hearing.[3]

¶17    This court affirmed. *See State v. Simmons*, Nos. 2003AP1455-CR and 2003AP1456-CR, unpublished slip op. ¶1 (WI App July 30, 2004). In that opinion, we reasoned that the proffered testimony of the two new witnesses did not "undermine the evidence that Simmons went on a rampage of revenge following a bar fight." *Id.*, ¶17. We stated that this was "Simmons' obvious motive for retaliation," and that the evidence in this case—particularly the testimony from "the three occupants of [P.S.G.]'s car and from Ramsey"—was "substantial and compelling." *Id.* Thus, we concluded that Simmons had not met his burden of demonstrating a "substantial degree of probability" that this new evidence would produce a different result if he was granted a new trial. *Id.*[4]

¶18    Simmons filed the underlying motion for postconviction DNA testing in March 2017. He seeks testing on "items with which Jones and C-Note likely

---

[3]  The Honorable David A. Hansher entered the order denying the motions, as the successor to Judge Crawford's calendar.

[4]  Simmons has since filed numerous other postconviction motions, including a *pro se* WIS. STAT. § 974.06 motion filed in December 2005 claiming, among other things, newly discovered evidence—an affidavit from a fellow prison inmate which stated that he had seen Simmons get into the red Cutlass on the night of the shooting. That motion was also denied by Judge Hansher, and we affirmed, again concluding that this alleged new evidence "did not establish a substantial degree of probability that a new trial would produce a different result." *See State v. Simmons*, No. 2006AP731, unpublished slip op. ¶¶1, 15 (WI App March 13, 2007). Simmons subsequently filed a petition for federal habeas corpus, which was also denied.

came in contact" that were recovered in and around the white vehicle: the bullet casings, the baseball cap, the bottles of alcohol, the head wrap, and the shoes.

¶19  The circuit court denied Simmons' motion. It concluded that there was really no useful exculpatory evidence that could be derived from DNA testing on those items. In particular, the court observed that the presence of someone else's DNA on the bullet casings would only suggest that another person had loaded the gun; it would not "exonerate [Simmons] as the shooter." Furthermore, the court noted that even if Simmons has satisfied the statutory conditions for bringing the motion, he had not persuaded the court that there was "a reasonable probability that DNA testing of the bullet casings would have had any material impact on the prosecution of this case or the outcome of the trial, particularly given the eyewitness testimony."

¶20  Simmons filed a motion for reconsideration of that decision. The circuit court ordered supplemental briefing regarding the issues raised by Simmons in that motion, but ultimately concurred with the conclusions of the initial decision denying Simmons' motion for postconviction DNA testing, and thus denied his motion for reconsideration.[5]  This appeal follows.

**DISCUSSION**

¶21  Although the parties disagree as to how the issues here should be framed, Simmons' argument on appeal is, essentially, that the circuit court erred in its determination that Simmons did not meet the requirements of WIS. STAT.

---

[5] The Honorable William S. Pocan issued the initial decision on Simmons' motion for postconviction DNA testing. Judge Hansher, as the successor to Judge Pocan's calendar, ordered the supplemental briefing and issued the order denying his motion for reconsideration. We refer to both of them as the circuit court.

7

§ 974.07 that would mandate court-ordered postconviction DNA testing of the items recovered in and around the white vehicle on the night of the shooting.

¶22    Under WIS. STAT. § 974.07(2), a defendant may, at any time after being convicted, file a motion requesting an order for DNA testing of evidence if all of the following factors are met:

> (a) The evidence is relevant to the investigation or prosecution that resulted in the conviction[.]
>
> (b) The evidence is in the actual or constructive possession of a government agency.
>
> (c) The evidence has not previously been subjected to forensic [DNA] testing or, if the evidence has previously been tested, it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results.

*Id.*

¶23    In reviewing such a motion, the circuit court must order the DNA testing requested if all of the following apply:

> 1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).
>
> 2. It is reasonably probable that the movant would not have been prosecuted [or] convicted … for the offense at issue in the motion under sub. (2), if exculpatory [DNA] testing results had been available before the prosecution [or] conviction[.]
>
> 3. The evidence to be tested meets the conditions under sub. (2)(a) to (c).
>
> 4. The chain of custody of the evidence to be tested establishes that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the

> evidence, the testing itself can establish the integrity of
> the evidence.

WIS. STAT. § 974.07(7)(a).

¶24     In this case, the circuit court based its denial of Simmons' motion primarily on Simmons' failure to meet the reasonable probability condition set forth in WIS. STAT. § 974.07(7)(a)2.  This court addressed this issue in *State v. Hudson*, 2004 WI App 99, 273 Wis. 2d 707, 681 N.W.2d 316, where the circuit court had denied the defendant's motion for court-ordered postconviction DNA testing based on his failure to meet the reasonable probability condition.  *Id.*, ¶¶1, 13.

¶25     In *Hudson*, we first discussed the standard of review for this issue. *See id.*, ¶14.  The defendant asserted that *de novo* review was appropriate for the question of "reasonable probability," similar to the analysis for ineffective assistance of counsel claims.  *Id.*  Under that analysis, prejudice to a defendant is demonstrated if, due to an error by trial counsel, there is a reasonable probability that the outcome of the proceeding would have been different.  *State v. Love*, 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62.  A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Id.* (citations and some quotation marks omitted).

¶26     On the other hand, the State in *Hudson* contended that the conditions of WIS. STAT. § 974.07(7)(a) are comparable to the review of claims of newly discovered evidence.  *Hudson*, 273 Wis. 2d 707, ¶15.  Under that test, a defendant must also prove that there is a reasonable probability of a different outcome, which exists if "there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt." *Love*, 284 Wis. 2d 111, ¶44 (quoting *State v. McCallum*, 208

Wis. 2d 463, 474, 561 N.W.2d 707 (1997); brackets in *Love*). However, for the newly discovered evidence analysis, this is a deferential determination made by the circuit court. *See McCallum*, 208 Wis. 2d at 480.

¶27 We concluded in *Hudson* that the deferential approach "fits best" for determinations regarding the conditions of WIS. STAT. § 974.07(7)(a). *Hudson*, 273 Wis. 2d 707, ¶16. We observed that the circuit court, "'[h]aving heard both the evidence at the original trial or hearing, or even just the evidence on the motion hearing … is in a better position than an appellate court to determine whether confidence in the correctness of the outcome at the original trial or hearing has been undermined.'" *Id.* (citation omitted). We therefore applied the erroneous exercise of discretion standard to the circuit court's determination that the defendant had not met the reasonable probability condition. *Id.*, ¶¶1, 16.

¶28 We are bound by the *Hudson* decision.[6] We therefore apply the erroneous exercise of discretion standard to this case. We will uphold a discretionary decision of the circuit court if it "'has examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.'" *Hefty v. Strickhouser*, 2008 WI 96, ¶28, 312 Wis. 2d 530, 752 N.W.2d 820 (citation omitted).

¶29 In its initial denial of Simmons' motion, the circuit court questioned the relevance of any potential exculpatory evidence that could be procured from the items as requested, because it would not result in an exoneration of Simmons as the

---

[6] In *State v. Denny*, 2017 WI 17, ¶81 n.21, 373 Wis. 2d 390, 891 N.W.2d 144, our supreme court noted, but declined to address, those parties' arguments regarding the proper standard of review for determinations of motions made pursuant to WIS. STAT. § 974.07. Therefore, in the absence of a different directive, we are bound by our decision in *State v. Hudson*, 2004 WI App 99, ¶16, 273 Wis. 2d 707, 681 N.W.2d 316, to apply the erroneous exercise of discretion standard. *See Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997).

shooter. In other words, the court did not believe that the third requirement of WIS. STAT. § 974.07(7)(a)—that all of the conditions of WIS. STAT. § 974.07(2) are met, including demonstrating the relevance of the evidence—had been established by Simmons.

¶30 Furthermore, the circuit court stated that even if the relevancy condition had been satisfied, the court was "not persuaded that there is a reasonable probability that DNA testing of the bullet casings would have had any material impact on the prosecution of this case or the outcome of the trial"—the second condition of WIS. STAT. § 974.07(7)(a). In particular, the court noted the eyewitness testimony of J.S.G., P.S.G., A.C., and Ramsey, who all identified Simmons as the shooter. The circuit court stated that even without any DNA evidence linking Simmons to the shooting, the jury was "obviously satisfied about [Simmons'] guilt beyond a reasonable doubt," based on that testimony as well as other evidence presented by the State.

¶31 The subsequent decision by the circuit court on Simmons' motion for reconsideration concurred with these findings. The circuit court noted that Simmons' argument is "predicated on the shaky assumption" that Jones' version of the events that night, as stated in her affidavit, is accurate. The circuit court further observed that Jones "did not appear at trial or testify in accordance with her affidavit" and that the trial court had "rejected [her affidavit] outright based on the eyewitness testimony at trial."

¶32 Simmons extensively argues that this eyewitness testimony was not credible. However, "[i]t is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts." *State v. Poellinger*, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990). Moreover,

> [t]he rule in Wisconsin is that the jury, as ultimate arbiter of credibility, has the power to accept one portion of a witness' testimony, reject another portion and assign historical facts based upon both portions. In short, a jury can find that a witness is partially truthful, partially untruthful and have both of these determinations mean something quite independent of one another.

*O'Connell v. Schrader*, 145 Wis. 2d 554, 557, 427 N.W.2d 152 (Ct. App. 1988). Thus, Simmons' arguments relating to the eyewitnesses' credibility are not compelling.[7]

¶33    In fact, Simmons' case has been reviewed by this court and others numerous times since his conviction, and his arguments have consistently been rejected due to the "substantial and compelling" evidence against Simmons that is contained in the record. *See Simmons*, Nos. 2003AP1455-CR and 2003AP1456-CR, ¶17. This evidence was reviewed again by the circuit court here in making its discretionary decisions regarding Simmons' motions. "Discretion contemplates a process of reasoning, which depends on the facts of record or that are reasonably derived by inference from the record, and a conclusion based on a logical rationale founded upon proper legal standards." *State v. Ziegler*, 2006 WI App 49, ¶21, 289

---

[7] Simmons also calls into question the veracity of the testimony of the investigating detective, Kevin Armbruster. This allegation is based on an unrelated case in which Armbruster was one of several detectives against which a lawsuit was filed by an individual whose conviction had been overturned; he claimed that Armbruster and another officer had failed to disclose exculpatory impeachment evidence during the investigation that led to his wrongful conviction. *See Avery v. City of Milwaukee*, 847 F.3d 433, 435 (7th Cir. 2017).

Simmons specifically calls into question A.C.'s statement to Detective Armbruster identifying Simmons as the shooter, pointing out inconsistencies in A.C.'s statement to police and her trial testimony. However, A.C.'s testimony was subject to cross-examination by Simmons' trial counsel. Furthermore, as we have already stated, a witness's credibility is to be determined by the jury, not this court. *See State v. Poellinger*, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990).

12

Wis. 2d 594, 712 N.W.2d 76.  We conclude that the circuit court did just that when it determined that Simmons had not met the requirement of demonstrating that there was a reasonable probability that he would not have been prosecuted or convicted if the items had been previously tested for DNA.  Therefore, the court did not erroneously exercise its discretion in denying Simmons' WIS. STAT. § 974.07 motion and his motion for reconsideration.

¶34    After his motion for reconsideration was denied, Simmons moved the circuit court for supplemental briefing.  His request was based on the briefing for the motion for reconsideration, wherein the State had informed the court and Simmons that of the evidence for which Simmons was seeking DNA testing, only the bullet casings remained; the other evidence had been destroyed.  Simmons had then asserted in his reply brief that the destroyed evidence was potentially exculpatory, and his due process rights had therefore been violated with its destruction.  Thus, Simmons sought supplemental briefing to allow for the State to respond to that allegation.

¶35    The circuit court denied this motion as well.  It based its decision on the two-pronged analysis set forth in *State v. Greenwold*, 189 Wis. 2d 59, 67-68, 525 N.W.2d 294 (Ct. App. 1994):  "[a] defendant's due process rights are violated if the police:  (1) failed to preserve the evidence that is apparently exculpatory; or (2) acted in bad faith by failing to preserve evidence which is potentially exculpatory."  We review *de novo* the circuit court's "application of a constitutional standard to the conduct of the police officers in preserving evidence."  *Id.* at 66.

¶36    The circuit court stated that its denial of Simmons' previous motions explained why it "does not agree with [Simmons'] assessment of the exculpatory value of any of [the] items" he sought to have tested.  Based on our review of the

record as discussed above, we agree with the circuit court's findings relating to the lack of exculpatory value of the evidence Simmons sought to have tested.

¶37     Consequently, as the circuit court observed, Simmons is "obligated to establish bad faith on the part of the police." The bad faith prong "can only be shown if: (1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; *and* (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence." *Id.* at 69.

¶38     Simmons does not allege—either in his motion or on appeal—bad faith on the part of the police in the destruction of the evidence. Instead, he argues that he should have been granted a hearing for fact-finding on the issue.

¶39     However, "[n]ot all [postconviction] motions require evidentiary hearings." *See* **State v. Balliette**, 2011 WI 79, ¶53, 336 Wis. 2d 358, 805 N.W.2d 334 (citation omitted). In contrast to pretrial motions, a postconviction motion "entails more demanding standards" because "once the criminal process has been completed and the defendant convicted and sentenced, the reasons that support a lesser sufficiency standard for pretrial motions are no longer compelling, and instead, we must consider the strong policy that favors finality." *Id.* (citations omitted). Therefore, a postconviction motion should allege "facts that would support [the defendant's] ultimate objective," as well as set forth what that defendant "intend[s] to prove at an evidentiary hearing, if one were granted." *Id.*, ¶69.

¶40     Simmons' motion fails to do this. Furthermore, as the circuit court pointed out, there is not "the *thinnest of shreds*" of evidence of any such bad faith

here. Therefore, we conclude that the circuit court properly denied his motion for supplemental briefing.

¶41 Accordingly, we affirm the circuit court's orders denying Simmons' motion for postconviction DNA testing, his motion for reconsideration, and his motion for supplemental briefing on the due process issue.

*By the Court.*—Orders affirmed.

Not recommended for publication in the official reports.