COURT OF APPEALS
DECISION
DATED AND FILED

August 20, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP2057-CR**

Cir. Ct. No. 2018CF2665

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

        PLAINTIFF-RESPONDENT,

  V.

SHAREFF J. CHILDS,

        DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed.*

Before White, C.J., Donald, P.J., and Colón, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Shareff J. Childs appeals from his judgment of conviction for second-degree sexual assault with use of force and kidnapping by carrying forcibly as an act of domestic abuse; he further appeals the order denying his motion for postconviction forensic deoxyribonucleic acid (DNA) testing, pursuant to WIS. STAT. § 974.07 (2021-22).[1]  Childs argues that the DNA testing swab taken from a belt allegedly used during the crime should be tested with new analysis methods.  The circuit court denied his motion concluding that there was not a reasonable probability of a different outcome even if the DNA analysis result was exculpatory.  Upon review, we agree with the circuit court and we affirm.

## BACKGROUND

¶2     Childs was charged with second-degree sexual assault and kidnapping as a domestic abuse incident, arising out of allegations that on June 6, 2018, he picked up his ex-girlfriend's daughter, Sandra, to take her to her job, but instead he drove her around Milwaukee, strangled her with a belt, threatened to kill her and her family, forced her to perform penis-to-mouth intercourse, and threw her cell phone out the window.[2]

¶3     The case proceeded to a jury trial in January 2021.[3]  Sandra testified that at the time of the charged offense, she was nineteen years old, working at

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] We employ pseudonyms for the victim and family members in this case, pursuant to WIS. STAT. RULE 809.86.

[3] The Honorable Stephanie Rothstein presided over Childs's trial and sentencing.  The Honorable Mark A. Sanders denied Childs's postconviction motion.  We refer to either judge as the circuit court.  Further, we note that Childs represented himself *pro se* after the circuit court accepted his waiver of counsel and appointed backup counsel.

Goodwill, and living with her mother, Tammy. Tammy had been in an on-again-off-again relationship with Childs since Sandra was a young child. Sandra testified that Childs picked her up around 7 a.m., pulled into an alley, placed a belt around her neck, started choking her, and told her he would kill her. Not able to get the belt loose and gasping for air, Sandra hit Childs in the face, unlocked her car door, unfastened her seatbelt, and pushed herself out of the car. Childs then jumped over the seat and tackled her to the ground, injuring her face, stomach, and legs. Childs then dragged her by her arm, climbed on top of her, and choked her with his bare hands.

¶4 Sandra testified that Childs ranted about her mother, accusing her of cheating. He then told her she should make up a story about being jumped and go to a hospital. However, when Sandra received a call from her employer during the time she was supposed to be at work, Childs took her phone and threw it out the window.

¶5 Sandra testified that Childs then drove into another alley and told her he wanted "to get [her] pregnant to get back at [her] mom." Sandra told Childs she was menstruating, and he told her she needed to give him penis-to-mouth oral sex to "make sure that [she] didn't tell." She said no, he started yelling and told her that she had to "or else." Childs grabbed her head and pushed her down and she put his penis in her mouth. She stopped and Childs told her that he should ejaculate on her face because it was helpful against acne, but she refused.

¶6 Sandra testified that she had been wearing a Goodwill sweatshirt and jeans for work, and Childs told her to change to remove the clothing with "bruises and stuff" on them. Childs gave her his niece's pajama pants to put on. Sandra

testified that her jeans were ripped and bloody from being dragged, but she did not know what he did with her clothing.

¶7    Sandra testified that Childs then started doing "crack stuff" by sniffing powder on a dollar bill through his nose. Although Childs offered her drugs, she refused. Childs got food at a McDonald's drive-thru, parked on a nearby street, and then realized his car wouldn't start. While he waited for a friend to jump start the car, he refused Sandra's request to go back to use the bathroom at McDonald's. Instead, Childs told her she had to urinate outside; she did so and left the McDonald's napkins she used to wipe in the gutter. Sandra testified that Childs told her not to move and not to look at the man he called to help him jump start the car. Sandra stated that she did not ask the man for help because she was not sure if he would help or hurt her.

¶8    Sandra testified that she lied to Childs that she had a short shift and needed to be home before her mother came home from work. Childs eventually dropped her off at home, telling her this would be their "little secret," and telling her to keep her bedroom window open so he could sneak in and have sex with her.

¶9    Sandra testified that she went inside, waited until Childs left, and told her brother what happened while crying. Her mother called the police when she arrived home. Sandra told the police what happened and showed the police the pajama pants, her shoes, her sweater, and her bruises. Sandra identified photographs of bloody underwear that she stated Childs had given to her in the car, underwear that belonged to his niece. Sandra tracked her cell phone using the "find my iPhone" function and her boyfriend retrieved it for her; the phone was found with a cracked screen. Sandra underwent a sexual assault examination at

the hospital, including DNA swabs. She informed the nurse about her pain in her knee caps, back, and throat.

¶10 During cross-examination, Childs questioned Sandra about her seemingly inconsistent statements that she testified that she landed on her front when she fell from the car, injuring her knees, and her statement to the police that she injured her back when she fell. Sandra testified that she landed on her back after Childs "jumped across on top of [her]." Childs challenged several other inconsistencies between her testimony and her reports to police including whether she began oral sex because he threatened her or because he grabbed her head and forced her mouth onto his penis and the timing of when she claimed he threw her phone out the car window.

¶11 The State then called multiple witnesses whose testimony corroborated Sandra's testimony. Sandra's brother, Victor; Sandra's mother, Tammy; Milwaukee Police Department (MPD) Detective Andrew Holzem; MPD Officer Zachery Thoms; and the nurse practitioner who examined Sandra each testified that she told them that Childs choked her with a belt, threatened to kill her, forced penis-to-mouth oral sex, and injured her knees, neck, and back while he held her against her will. All described her as upset, crying, or shaking while she told them what Childs did to her. Only Officer Thoms testified that Sandra said Childs ejaculated during the assault, but she told each of them about the forced oral sex.

¶12 Sandra's brother, Victor, testified that Sandra told him that Childs "kidnapped [her]." Tammy testified that she called the police after Victor told her what Sandra said; she described Sandra as having a bloody lip, bloody knees, ripped pants, scratches, and messed up hair. Detective Holzem reviewed police

5

photographs of Sandra's injuries to her neck, lip, and knees; bloody underwear she had worn; the McDonald's napkins she used after urination; a black jacket and a Dickies belt found in the search of Childs's car; and surveillance video footage from McDonald's that appeared to show Childs and Sandra. Officer Thoms testified about Sandra telling him about trying to escape from Childs, but being thrown and injured. The officer testified about the black Pelle Pelle brand jacket recovered from Childs's car that matched the description given by Sandra for the jacket Childs used to shield her while she urinated in the street. He also testified about Sandra's phone records that matched the unanswered texts and calls from her employer and boyfriend while Childs held her.

¶13    The State called a forensic scientist in the DNA analysis unit in the State Crime Laboratory, who testified about the DNA testing results. Of the three swabs taken on Sandra's mouth, chin, and neck, the chin sample showed "a mixture profile of two individuals" with a "major contributor [that] was consistent with the Y[-]STR profile developed from the standard of Shareff Childs." She also found male DNA on Sandra's neck. She tested two areas of the belt, one was "not suitable for analysis" and the other showed "a mixture of four people that had at least two males in it, and due to the complexity of the mixture, [she] was unable to do any comparisons to that mixture profile."

¶14    The State also called the nurse practitioner who performed Sandra's sexual assault examination on June 6 and 7, 2018, as well as the police detective who conducted a ***Mirandized***[4] interview with Childs on June 7. Selections from Sandra's medical records and Childs's police interview were shown to the jury.

---

[4]  ***Miranda v. Arizona***, 384 U.S. 436 (1966).

¶15    The jury returned guilty verdicts on second-degree sexual assault, and kidnapping by carrying forcibly as an act of domestic abuse.  The court sentenced Childs to a term of twenty-eight years of imprisonment on both counts, composed of consecutive sentences of fifteen years on the sexual assault offense, bifurcated as nine years of initial confinement and six years of extended supervision, and thirteen years on the kidnapping offense, bifurcated as eight years of initial confinement and five years of extended supervision.

¶16    In August 2022, Childs moved for postconviction DNA testing and analysis on the belt using STRmix methodology.  In November 2022, the circuit court denied Childs's postconviction motion.  The court concluded that "the absence of the defendant or the victim's DNA on the belt does not cast doubt on the victim's testimony, establish that it was not used in this offense, or make it any less likely that the defendant committed the offenses."  The court held that the only dispositive outcome from testing would be to find Childs's and Sandra's DNA on the belt, which would be inculpatory, not exculpatory.  The court also concluded that there was evidence of use of force beyond the specific allegation about the belt meaning the jury could have doubted the involvement of the belt, but still found Childs guilty of the charged offenses.

¶17    Childs now appeals.

## DISCUSSION

¶18    Childs argues that the circuit court erred when it denied his motion for further forensic DNA testing on the belt because he satisfied all the requirements of WIS. STAT. § 974.07(7)(a).  The State argues that the circuit court acted within its discretion to deny Childs's motion because there was not a

reasonable probability that he would not have been convicted even if exculpatory DNA test results from the belt had been available.

¶19 After conviction, a defendant may move for postconviction DNA testing of evidence that satisfies three conditions: (1) the evidence is relevant to the conviction; (2) the evidence is in the "possession of a government agency"; and (3) if the evidence has been previously subjected to forensic DNA testing, "it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results." WIS. STAT. § 974.07(2). The circuit court must order DNA testing for evidence under subsection (2) if the following four factors apply: (1) the defendant claims innocence of the offense; (2) "[i]t is reasonably probable that the movant would not have been … convicted … for the offense at issue in the motion under sub. (2), if exculpatory [DNA] testing results had been available before the … conviction"; (3) the evidence satisfies the conditions in § 974.07(2); and (4) the chain of custody of the evidence establishes that the evidence has not been tampered with, replaced, or altered. Sec. 974.07(7)(a).

¶20 Childs's appeal rests on the circuit court's finding that there was not a reasonable probability of conviction if the DNA evidence from the belt had been subjected to the requested testing regimen. There does not appear to be a dispute about Childs's claim of innocence, the condition of the evidence satisfying WIS. STAT. § 974.07(2), or the chain of custody. Therefore, we do not discuss those factors or conditions any further.

¶21 "[W]e review the [circuit] court's 'reasonable probability' determination under WIS. STAT. § 974.07(7) under the erroneous exercise of

discretion standard." *State v. Hudson*, 2004 WI App 99, ¶16, 273 Wis. 2d 707, 681 N.W.2d 316. "A court properly exercises its discretion if it relies on the relevant facts in the record and applies the proper legal standard to reach a reasonable decision." *State v. Edmunds*, 2008 WI App 33, ¶8, 308 Wis. 2d 374, 746 N.W.2d 590.[5] For this analysis, we assume that if the DNA testing were to occur, the results would be exculpatory. *State v. Denny*, 2017 WI 17, ¶76, 373 Wis. 2d 390, 891 N.W.2d 144. Therefore, the question before this court "is whether it is reasonably probable that exculpatory DNA testing results would raise a reasonable doubt about [Childs's] guilt." *Hudson*, 273 Wis. 2d 707, ¶17.

¶22    Childs argues that there is a reasonable probability that he would not have been convicted if the exculpatory STRmix testing of the belt DNA samples had been available. He asserts that if the jury looked at the old evidence, meaning the evidence presented at trial, and the new evidence, meaning new DNA testing results based on STRmix analysis, this would have raised reasonable doubt about his guilt. *See State v. McCallum*, 208 Wis. 2d 463, 475, 561 N.W.2d 707 (1997), *holding modified by State v. Kivioja*, 225 Wis. 2d 271, 592 N.W.2d 220 (1999).

¶23    Childs first argues that the struggle and friction on the belt that Sandra described would mean that DNA from both parties would be expected to be found. This is speculative and misstates the evidence from the trial. The record reflects that the DNA analyst testified that touch DNA might appear on the

---

[5] We decline to address Childs's argument that the standard of review is *de novo*. Although our supreme court has considered a *de novo* standard of review for the reasonable probability factor in WIS. STAT. § 974.07(7)(a)2., it has not settled the question, and it has not overruled *State v. Hudson*, 2004 WI App 99, ¶16, 273 Wis. 2d 707, 681 N.W.2d 316, which held that the erroneous exercise of discretion standard was appropriate. *State v. Denny*, 2017 WI 17, ¶¶74-76, 373 Wis. 2d 390, 891 N.W.2d 144.

belt in a struggle, the actual appearance was dependent on multiple factors including the length of time the object was touched, how the object was handled, and the individual likelihood of a person shedding DNA. We conclude that exculpatory DNA testing showing that neither Childs nor Sandra's DNA was present on the belt would not disprove Sandra's testimony that Childs wrapped the belt around her neck, and it would not dispute Sandra's testimony that Childs choked her with his bare hands, sexually assaulted her, or held her against her will.

¶24 Second, Childs asserts that a DNA testing result that Childs's DNA was not found on the belt would undermine Sandra's credibility, upon which the State's case depended. Childs contends that Sandra's credibility was already at issue due to inconsistencies in her testimony about when she got out of the car, whether she fell to her front or back; where the sexual assault happened; and whether Childs hit her with his hands. We disagree. Childs cross-examined Sandra extensively about these inconsistencies; therefore, the issue was already placed before the jury and was within its province to determine credibility and facts. *State v. Kucharski*, 2015 WI 64, ¶24, 363 Wis. 2d 658, 866 N.W.2d 697.

¶25 In contrast, the State argues that the totality of evidence presented at trial undermines Childs's claim that the STRmix analysis would create a reasonable probability of acquittal. *Hudson*, 273 Wis. 2d 707, ¶¶17, 19. The record reflects that the State presented compelling evidence that Childs was guilty of second-degree sexual assault and kidnapping. Sandra's testimony satisfied the elements of the offenses, and her testimony was consistent with the testimony from her brother, the investigating police detective and officer, and the nurse practitioner.

¶26 The circuit court concluded that Childs had not met his burden because even if the STRmix DNA test analysis showed neither his nor Sandra's DNA, given the overwhelming evidence of his guilt, there was not a reasonable probability he would not have been convicted. The court concluded that exculpatory DNA testing of the belt would "not cast doubt on [Sandra's] testimony, establish that [the belt] was not used in this offense, or make it any less likely that [Childs] committed the offenses." The court found "there was evidence of use of force beyond the specific allegation regarding the use of the belt; the jury could have doubted that a belt was involved but still found [Childs] guilty." We agree. The absence of Childs's and Sandra's DNA on the belt would not create reasonable doubt that Childs was guilty of the offense.

¶27 Consequently, because Childs has not established a reasonable probability that he would not have been convicted, the circuit court did not erroneously exercise its discretion by denying his motion for postconviction DNA testing using STRmix analysis. *Hudson*, 273 Wis. 2d 707, ¶21.

**CONCLUSION**

¶28 For the reasons stated above, we conclude that the circuit court acted within its discretion to deny Childs's motion for postconviction DNA testing under WIS. STAT. § 974.07(7)(a) because he failed to establish there was a reasonable probability of a different outcome if exculpatory DNA evidence had been available.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.